LOUISVILLE & N. R. CO. v. HUGHES et al.

(District Court, S. D. Ohio, W. D. October 18, 1912.)

No. 6,817.

1. COMMERCE (§ 12*)—POWER OF STATES TO REGULATE—SCOPE.

A state has exclusive power to regulate commerce wholly within its borders, and the Constitution gives exclusive power to Congress to regulate commerce between the states, each being sovereign with respect to the subjects committed to it; and, while the Constitution and the laws made pursuant thereto are the supreme law of the land, nevertheless a state may legislate in a great variety of ways so as to affect interstate commerce and persons engaged in it without constituting a regulation of it within the meaning of that instrument.

[Ed. Note.—For other cases, see Commerce, Cent. Dig. §§ 7, 9; Dec. Dig. § 12.*]

2. COMMERCE (§ 12*)—STATE REGULATION—LEGISLATION AFFECTING INTERSTATE RAILROADS.

The dominant power of Congress over interstate commerce does not take from the states the power of legislation with respect to the instruments of such commerce so far as the legislation is within the ordinary police powers of the state, and affects interstate commerce only indirectly and incidentally, and such power may be exercised through an administrative board.

[Ed. Note.—For other cases, see Commerce, Cent. Dig. §§ 7, 9; Dec. Dig. § 12.*]

3. COMMERCE (§ 12*)—STATE REGULATION—SCOPE OF POWER—INTERSTATE COMMERCE.

A state act, however, which necessarily by its requirements brings about a conflict with the requirements of an act of Congress on the same subject passed in the exercise of its exclusive power over interstate commerce, produces that direct interference with such commerce which is not permissible.

[Ed. Note.—For other cases, see Commerce, Cent. Dig. §§ 7, 9; Dec. Dig. § 12.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

4. COMMERCE (§ 8*)—INTERSTATE COMMERCE—STATE REGULATION—EFFECT OF FEDERAL LEGISLATION.

The passage by Congress of an act regulating interstate commerce (Act Feb. 17, 1911, c. 103, 36 Stat. 913 [U. S. Comp. St. Supp. 1911, p. 1333]), thus showing its intention to exercise its constitutional power over the particular subject-matter of the act, from the date of such passage excludes the power of the states to legislate with respect to the same subject-matter and supersedes any state law then in force relating thereto, and this, although the federal act is not to take effect until a subsequent date.

[Ed. Note.—For other cases, see Commerce, Cent. Dig. § 5; Dec. Dig. § 8.*]

5. COMMERCE (§ 8*)—INTERSTATE COMMERCE—REGULATION OF LOCOMOTIVE BOILERS—LAW GOVERNING.

Act Ohio May 20, 1910 (101 Ohio Laws, p. 328), and the regulations adopted thereunder and Act Cong. Feb. 11, 1911, c. 103, 36 Stat. 913 (U. S. Comp. St. Supp. 1911, p. 1333), and the regulations adopted thereunder contain very similar provisions and requirements for the inspection and equipment of locomotive boilers, except that the state law requires certain things to be done in addition to those required by the federal law, and that its requirements as to equipment shall be complete prior to January 1, 1912, and that a specification card for each boiler shall be made and filed by the same date, while the federal act requires the work of equipment to be completed prior to July 1, 1914, and the specification cards to be filed by July 1, 1913. The preparation of such cards in cases where no drawings of the boiler are available requires it to be largely dismembered, and, except when general repairs are being made, involves an expense of several hundred dollars, and the keeping of the engine out of service for a considerable time. Each of said acts embodies what is intended as a complete and comprehensive scheme for rendering the boilers safe in use. One applies by its terms to all locomotives used on railroads in the state and the other to all used in interstate commerce. *Held* that, while the state law was valid and enforceable prior to the enactment of the federal law, it was superseded by the latter as applied to a railroad company whose engines only entered the state from Kentucky to a terminal in Cincinnati and when being used in interstate commerce, and that such company was governed by the federal law from the time of its enactment as to the things required and the time of their completion.

[Ed. Note.—For other cases, see Commerce, Cent. Dig. § 5; Dec. Dig. § 8.*]

In Equity. Suit by the Louisville & Nashville Railroad Company against Oliver H. Hughes, Oliver P. Gothlin, and John C. Sullivan, as members of the Public Service Commission of Ohio. On motion for interlocutory injunction. Granted.

The case involves an act of the Legislature of Ohio entitled "An act to promote the safety of employés and travelers upon railroads by compelling railroad companies to equip their locomotives with suitable boilers and appurtenances thereto," passed May 10, 1910, approved May 20, 1910 (101 Ohio Laws, p. 328), and regulations adopted by the Railroad Commission of Ohio in pursuance of its provisions August 11, 1910, and an act of Congress entitled "An act to promote the safety of employés and travelers upon railroads by compelling common carriers engaged in interstate commerce to equip their locomotives with safe and suitable boilers and appurtenances thereto," approved February 17, 1911 (1911 Supp. U. S. Comp. Stat. of 1901, p. 1333; 36 U. S. Stat. part 1, p. 913), and regulations adopted by the Interstate Commerce Commission in pursuance of its provisions June 2, 1911.

It will be sufficient to set out the substance of these laws.

The Ohio act:

The operators of steam railroads wholly or in part within the state are required to make a thorough inspection of the boilers and appurtenances of their locomotives. Requirements are made affecting the material for construction, openings for water and steam, dimensions of pipes, sufficiency of spaces between and around flues, boilers, furnaces, safety valves, fusible plugs, low-water indicators, feed water apparatus, gauge cocks, steam gauges, means of removing mud and sediment from the boiler, and all other machinery, to the end that all of these in construction, shape, condition, arrangement, and material may be safely employed without peril to life or limb. The duties of the inspector are set forth, and the times within which and the persons by whom inspections are to be made. Power is given the State Railroad Commission to formulate rules and regulations for the inspection and testing of boilers and other appurtenances, and other duties are prescribed including the appointment of a competent person as inspector who shall have charge of the inspection and perform such other duties as the Commission shall direct. If the inspector approves of the boiler and appurtenances, he shall, after taking certain steps, subscribe a certificate, one copy of which shall be filed with the officer or employé of the railroad having immediate charge of the operation of the boiler, who shall place the certificate "in a conspicuous place in the cab connected with the locomotive boiler inspected, and there kept framed under glass." A penalty for each offense of omission or neglect in compliance with the provisions of the law and a further penalty of $100 for each day of such omission or neglect are prescribed. The duty is imposed on the State Railroad Commission to enforce the provisions of the act, and September 1, 1910, was the day fixed on and after which the act should take effect.

The Public Service Commission of Ohio is the successor of the State Railroad Commission, and is invested with its predecessor's powers (102 Ohio Laws, p. 549, § 2), and section 502 of section 1 provides that the provisions of the act "shall not apply to the regulation of commerce with foreign nations, and among the several states, and with the Indian tribes." August 11, 1910, the Railroad Commission adopted elaborate regulations for "inspecting, testing and washing locomotive boilers." It is not necessary to set forth the elaborate details of these comprehensive regulations except in the instances specifically herein noted by quotations.

"(e) Telltale holes. All stay bolts shorter than eight inches applied after September 1, 1910, except flexible bolts, shall have telltale holes $3/16$ inch in diameter by $1\frac{1}{4}$ inches or more, in the outer end. These holes must be kept open at all times, and must not in any case be plugged. All stay bolts shorter than eight inches, except flexible bolts, shall be drilled when the locomotive is in the shop for heavy repairs or at other suitable opportunity, and this work must be completed prior to January 1, 1912."

"Note.—Applications from companies desiring to omit the use of telltale holes will be considered when it can be shown to the satisfaction of the Commission that unusual care is used in stay bolt testing both as to the frequency of the tests and the selection of inspectors."

"(a) Specification Card. A specification card, Form No. 17, containing the results of the calculations made in determining the working pressure and other necessary data shall be filed in the office of the Railroad Commission of Ohio for each locomotive boiler. A copy shall also be filed in the office of the chief mechanical officer having charge of the locomotive. Every specification card shall be verified by the oath of the engineer making the calculations, and shall be approved by the chief mechanical officer. These specification cards shall be filed as promptly as thorough examination and accurate calculation will permit. Where accurate drawings of boilers are available, the data for specification card, Form No. 17, may be taken from the drawings, and such specification cards must be completed and forwarded prior to March 1, 1911. Where accurate drawings are not available, the required data must be obtained at the first opportunity when general repairs are made, or when flues are removed. Specification cards must be forwarded within one month after examination has been made, and all examinations must be com-

pleted and specification cards filed prior to January 1, 1912, flues being removed, if necessary to enable the examination to be made before this date." The act of Congress:

From and after July 1, 1911, it is unlawful for any common carrier, its officers or agents, subject to the act, to use any locomotive engine propelled by steam power in moving interstate or foreign traffic, unless the boiler of the locomotive and appurtenances are in proper condition and safe to operate in interstate commerce, without unnecessary peril to life or limb; and all boilers must be inspected in accordance with the provisions of the act, and be able to withstand such tests as may be prescribed in the rules and regulations to be promulgated by the Interstate Commerce Commission. Provision is made for the appointment of a chief inspector and assistants who shall be selected with reference to their practical knowledge and ability to carry out the provisions of the act, and who shall have superintendence of other inspectors with power to direct them in their duties, to the end that the act and the regulations are observed by the common carriers of interstate commerce. The territory of the United States is by the act divided into 50 locomotive boiler inspection districts, looking to effective service and uniformity of the work required of each inspector, one inspector being appointed to each district, and the inspectors shall be examined touching their qualifications. Each carrier is required to file its rules and instructions for the inspection of locomotive boilers with the chief inspector within three months after the approval of the act, and such rules, after hearing and approval by the Interstate Commerce Commission, shall become obligatory upon the carrier. Upon failure of the carrier to so file its rules and instructions, the chief inspector shall prepare rules and instructions for the inspection of the boilers, which, when approved by the Commission, shall be obligatory. Changes may be made by the carrier to take effect when they have been approved by the Commission. Duties detailed in character are imposed on each inspector, and duties are imposed upon the carriers with respect thereto, reports are provided for, and provision is made for putting locomotives with defective boilers out of commission. The chief inspector must make an annual report to the Commission. In case of accident resulting from failure from any cause of a boiler or its appurtenances, causing injury or death, the carrier must report in writing to the chief inspector who, or one of his assistants, shall investigate. Parts of the disabled locomotives shall be preserved and reports made of the cause of the accident. The Commission may give publicity to this report, together with such recommendations as it deems proper. Failure of compliance with the act or regulations made under its provisions subject the carrier to a penalty of $100 for each violation of the law to be recovered in a suit by the district attorney in the district court having jurisdiction. Approved February 17, 1911.

June 2, 1911, elaborate regulations were adopted by the Interstate Commerce Commission for the "inspection and testing of locomotive boilers and their appurtenances." It is recited that at the expiration of the three months after the approval of the act many common carriers had failed to file their rules and instructions for inspections as provided by the act, and thereupon the chief inspector proceeded to prepare for submission to the Commission for its approval rules and instructions for the carriers having so failed; and upon notice there was a hearing before the Commission May 29, 1911, on the rules and instructions so prepared, that such carriers as had filed their rules and instructions within the three months asked at the hearing that such rules and instructions not fulfilling the requirements of the proposed rules and instructions prepared by the chief inspector be modified to conform thereto, and that in the respects in which their rules and instructions as prescribed a higher standard than that fixed by the chief inspector might be withdrawn, and such carriers "joined in a request that such rules and regulations as had been prepared by the chief inspector and approved by the Interstate Commerce Commission be established with uniformity for them and all other carriers subject to the act." Upon submission to the Commission of the rules and instructions prepared by the chief inspector, it was ordered that they be and they were thereby approved and made obligatory

from and after July 1, 1911, "provided, that nothing herein contained shall be construed as prohibiting any carrier from enforcing additional rules and instructions not inconsistent with the foregoing," tending to a greater degree of precaution against accidents."

No detailed reference to these comprehensive regulations is necessary other than by the quotations below.

"(26) Telltale holes. All stay bolts shorter than 8 inches applied after July 1, 1911, except flexible bolts, shall have telltale holes three-sixteenths inch in diameter and not less than 1¼ inches deep in the outer end. These holes must be kept open at all times.

"(27) All stay bolts shorter than 8 inches, except flexible bolts and rigid bolts which are behind frames and braces, shall be drilled when the locomotive is in the shop for heavy repairs and this work must be completed prior to July 1, 1914."

"(52) A monthly inspection report or quarterly inspection card properly filled out shall be placed under glass in a conspicuous place in the cab of the locomotive before the boiler inspected is put into service."

"(54) Specification Card. A specification card, size 8 by 10½ inches, Form No. 4, containing the results of the calculations made in determining the working pressure and other necessary data shall be filed in the office of the chief inspector of locomotive boilers, for each locomotive boiler. A copy shall be filed in the office of the chief mechanical officer having charge of the locomotive. Every specification card shall be verified by the oath of the engineer making the calculations, and shall be approved by the chief mechanical officer. These specification cards shall be filed as promptly as thorough examination and accurate calculation will permit. Where accurate drawings of boilers are available, the data for specification card, Form No. 4, may be taken from the drawings, and such specification cards must be completed and forwarded prior to July 1, 1912. Where accurate drawings are not available, the required data must be obtained at the first opportunity when general repairs are made, or when flues are removed. Specification cards must be forwarded within one month after examination has been made, and all examinations must be completed and specification cards filed prior to July 1, 1913, flues being removed if necessary to enable the examination to be made before this date."

It is not necessary to set forth the many respects in which the respective regulations are substantially the same, nor to refer to all of the differences between them. For the purposes of this case, it will be sufficient to consider in detail only those differences to which particular attention is called in the opinion.

The complainant, a corporation of Kentucky, is a common carrier whose railroad extends through 13 different states, a part of it being in the state of Ohio. Of its locomotives 75 are operated at different times in the transportation of persons and property from Cincinnati, Ohio, to points in Kentucky, and states south thereof, and from Kentucky and such states to Cincinnati. It is not otherwise engaged in the business of a common carrier, nor does it otherwise operate any railroad in Ohio, nor otherwise run any locomotive in that state, and all of its locomotives operated in Ohio are operated and used exclusively as instrumentalities of interstate commerce.

The complainant did not file any rules and instructions for inspection of their locomotives within the three months limited by the act of Congress, which action was in pursuance of a general desire of the common carriers engaged in interstate commerce for the establishment of uniform regulations. The complainant on September 30, 1910, October 12, 1910, and November 18, 1911, made application to the Railroad Commission of Ohio for exemption from the regulation requiring the use of telltale holes, having shown that unusual care was used by it in stay bolt testing, and on November 22, 1911, its application was denied by the Public Service Commission on the ground that the Commission was then opposed to the granting of exemption from the use of telltale holes in stay bolts of locomotives in any case. The telltale holes referred to are holes drilled lengthwise in stay bolts less than 8 inches in length after the stay bolts have been placed in their final position in the

boilers and riveted. Their purpose is to afford an opportunity to observe the existence of any crack or break in the stay bolts, because, if the stay bolts should break or crack, water from the boiler would ooze out through the telltale holes. The stay bolts when in position and riveted become a portion of the boiler structure, and are subjected equally with all other portions of the boiler to the pressure of steam generated within. Their number is very large and their drilling requires much time, expense, and labor; the locomotive necessarily being out of commission when so operated upon.

When accurate drawings of the boiler of a locomotive are not available, the examination required and which is necessary to be made for the filling out and filing of the specification card "consists in a dismembering of the principal parts of the locomotive boilers; that there are within each locomotive boiler, extending from the front flue sheet to the back end flue sheet, a large number of tubes known mechanically as flues; that the number of these flues varies with the size and type of the boiler, and that such number varies from something over two hundred to something over four hundred in each boiler; that the said flues are so distributed throughout the interior of the boiler as to make it impossible for an engineer or workman to enter the boiler to make the measurements necessary for calculating the various matters required to be reported in the specification cards referred to in said regulation; that the said flues are attached to the flue sheets by being forced into holes made in the flue sheets for that purpose, and that, when in position and when the boiler is in use, the said flues serve the purpose of carrying hot air, smoke, and cinders from the fire box through the boiler to the smoke chamber at the forward end of the boiler, and so furnishing the heat necessary to convert the water in the boiler into steam; that the dismembering of the boiler necessary for an examination by an engineer or workman for the purpose of ascertaining the data upon which the calculations are required to be made for said specification cards, consists in driving said flues out of the flue sheets in which they are firmly held; that, when the flues are so driven out and removed, the examiner is enabled to enter the boiler by opening the throttle box at the top of the boiler, and so make his measurements required as aforesaid; that, when the flues are driven out of the flue sheets, the ends of the flues are so injured that it is necessary that they be cut off and new ones welded upon the old flues before they can be replaced in the boiler; that the taking a locomotive out of service and so dismembering it and making such examination and then reassembling the parts removed involves an expense * * * in the case of each locomotive of approximately four hundred ($400.00) dollars; that the making of such specification cards for each locomotive by an examination of the boiler when it is so dismembered or stripped, involves an expenditure * * * in each case of ten ($10) dollars; that the making up of specification cards from accurate drawings, available for that purpose, involves in each case an expenditure * * * of three ($3) dollars."

The calculations required to be made are the same calculations, the same examinations, and involve the same work in order to comply with the regulations adopted under each law, and inconsistencies in compliance with the terms of each of the regulations referred to with reference to specification cards relate chiefly to the time at which the cards shall be completed.

It is alleged by the complainant that the defendants claim the right to enforce all of the regulations as adopted by the Public Service Commission of Ohio, and especially the claim to enforce section 5 (e), relating to telltale holes, and section 12 (a), relating to specification cards, and the right to enforce the penalties provided by the act of the General Assembly of Ohio against the complainant for its noncompliance with the regulations adopted by the Public Service Commission of Ohio, and particularly with reference to telltale holes and specification cards; and that the defendants threaten to subject complainant's locomotives to the personal examination of the inspectors of the defendants and thereby to interfere with complainant's locomotives in their use and service as instrumentalities employed in interstate commerce and subject to the regulations approved by the Interstate Commerce Commission.

The complainant complied with the regulations adopted pursuant to the Ohio act up to the time of the approval by the Interstate Commerce Commission of the regulations adopted by it, and has complied with the latter since their adoption.

The complainant claims that the Ohio act and the regulations under its provisions are, as against it, contrary to article 1, § 8, of the Constitution, particularly section 8, which gives Congress the power to regulate commerce among the several states—and are in contravention of the laws of the United States enacted in pursuance thereof; that the act of Congress and regulations thereunder supersede all state legislation and regulations upon the same subject-matter; and on the ground that it will, unless the defendants are restrained, be subjected to a multiplicity of actions for penalties and suffer irreparable injury in defending them and to repeated and irreparable injury in the attempted interference by the defendants with the operation by the complainant in the state of Ohio of its locomotives, prays that the defendants may be enjoined, etc.

The statements of fact in the bill are verified by the affidavit of Brent Arnold, G. F. A. and superintendent of terminals of complainant, and are not, in substance, denied by the defendants, except as to conclusions of fact drawn by the complainant; all conclusions of law, of course, being denied.

The defendants show by the affidavit of John J. Fox, their chief inspector of locomotive boilers, that the rules and regulations of the state of Ohio and of the Interstate Commerce Commission "are substantially the same"; that the differences existing between the two are in matters of detail, and that these differences do not interfere or conflict; that the rules and regulations of the two sovereignties are not inconsistent, conflicting, or repugnant to each other; that the requirements of the Railroad Commission of Ohio and of the Interstate Commerce Commission are the minimum requirements of safety, "and that the maintenance of a higher degree or standard of safety than is provided by either of said rules and regulations would be a compliance with both of said rules and regulations; that in every case where one or the other of such rules and regulations require a higher degree or standard of safety than the other provides a compliance with the higher standard required by one will be a compliance with the lower degree or standard of safety required by the other," and that both can be complied with without involving any great inconvenience or burdensome expenditure of money; that the greater part of any additional expense required will be on account of filing two reports instead of one; that compliance with both regulations will not lead to confusion, and will add to the efficiency and safety of the locomotives involved.

Under the authority of the act of Congress approved June 18, 1910 (36 Stat. p. 557, c. 309, § 17), application was made by the complainant to one of the judges in the Southern District of Ohio for a temporary restraining order against the defendants pending the hearing and determination of the application for an interlocutory injunction. Pursuant to the requirements of the act, the district judge immediately called to his assistance two other judges, and, pending the hearing, a temporary order was issued as prayed for.

Kinkead & Rogers, of Cincinnati, Ohio, and Henry L. Stone, of Louisville, Ky., for complainant.

Timothy S. Hogan, Atty. Gen., and John A. Deasy, Asst. Atty. Gen., for defendants.

Before WARRINGTON and KNAPPEN, Circuit Judges, and HOLLISTER, District Judge.

HOLLISTER, District Judge (after stating the facts as above). It is the urgent contention of the defendants that the act of the General Assembly of Ohio and the regulations adopted by the Railroad Commission of that state, and the act of Congress and the regulations

adopted by the Interstate Commerce Commission, present no real points of conflict with each other, that the Ohio regulations affect intrastate commerce directly and interstate commerce only indirectly, and the federal regulations affect interstate commerce directly and intrastate commerce only indirectly, and therefore the state, having the right to legislate with respect to intrastate commerce, over which Congress has no power, and Congress having the right to legislate with respect to interstate commerce, over which the state has no power, the two acts and regulations may proceed together and have concurrent operation, each being an exemplification of the power of an independent sovereignty concerning a subject-matter over which it may lawfully exercise a complete jurisdiction without direct interference with the other.

If defendants' premises were true, their conclusion might present a question for judicial inquiry, but the soundness of their logic need not be debated; for, whether their conclusion has any sanction in the law or not (of which no opinion is here expressed), it is founded upon a misapprehension of the operation of these laws and regulations upon the complainant who employs locomotives as instrumentalities of interstate commerce, and of complainant's right under the Constitution of the United States. Whether or not the fact that these locomotives are engaged solely in such commerce and not directly subject to the authority of the state under any circumstances would make a different case from one in which the locomotives were instrumentalities of both intrastate and interstate commerce need not be considered (if, indeed, there would be any difference), because the case, as made, has to do only with locomotives engaged in interstate commerce, a subject over which the state has no direct control.

While the purposes of the acts are identical and in most respects the regulations are alike, being in many instances even verbally the same, yet there are differences between them. The resemblances are many and in this discussion are important, in that they, with the differences, show the comprehensive nature of the legislation, and the elaborate detail of the regulations to effect the purposes of the acts, thereby disclosing the extent of regulation to which the respective sovereignties intended to go in order to provide for the safety of persons subject to injury from defective locomotive boilers. The resemblances are to be borne in mind, but this case emphasizes the differences; for it is upon these that complainant founds its claims of a conflict between the regulations of such character that the federal regulations do and must, under the interpretation by the Supreme Court of the commerce clause of the Constitution, necessarily supersede and displace the state regulations, so far as complainant's particular locomotives are concerned.

The complainant does not raise, and it is not thought necessary to discuss, a question suggested by the subject-matter—whether or not it is national in character and admits only of one uniform system or plan of regulation, hence a matter with which Congress alone can deal in the exercise of the exclusive jurisdiction in such cases confided to it by the Constitution (Mobile County v. Kimball, 102 U.

S. 691, 697, 26 L. Ed. 238; Wabash, etc., R. Co. v. Illinois, 118 U. S. 557, 574, 7 Sup. Ct. 4, 30 L. Ed. 244; Robbins v. Shelby Taxing District, 120 U. S. 489, 492, 493, 7 Sup. Ct. 592, 30 L. Ed. 694; Northern Securities Case, 193 U. S. 197, 371, 24 Sup. Ct. 436, 48 L. Ed. 679, as illustrations); for an affirmative answer to the question would not be of benefit to the defendants, and a negative conclusion would still leave the question of the conflict of these regulations open for decision. It is therefore, for the purposes of this case, assumed that the doctrine referred to in the illustrative cases does not apply to the subject-matter of this.

The power of the state of Ohio, in the absence of congressional action, to provide in the manner it has for the inspection of all locomotive boilers within the state, even though a burden. may be thereby incidentally imposed on the owners of locomotives engaged solely in interstate commerce, is conceded by the complainant, which, until the federal regulations were adopted, complied with all of the state requirements, the effectiveness of the operation of which upon it as a carrier of interstate commerce it did not up to that time challenge, and does not now deny; but ever after congressional action and the adoption of the federal regulations it has asserted, and in this suit asserts, the invalidity as to it of the state requirements, claiming that its duties with respect to boiler inspection are prescribed by the Interstate Commerce Commission to whose regulations alone it is amenable, when they are in conflict with the state regulations or cover the same ground as the state legislation. Considering the case, therefore, only as one of the many involving both state and congressional legislation on the same subject, it is necessary to inquire into the relative powers of the states and of Congress under the Constitution, so far as they have been defined by the Supreme Court.

The principles involved in complainant's concession are so related to others necessarily to be discussed that some reference to them also is required.

[1] A state has exclusive power to regulate commerce wholly within its own borders (Gibbons v. Ogden, 9 Wheat. 1, *195, 6 L. Ed. 23; Sands v. Manistee River Imp. Co., 123 U. S. 288, 295, 8 Sup. Ct. 113, 31 L. Ed. 149; Allen v. Pullman Co., 191 U. S. 171, 180, 181, 24 Sup. Ct. 39, 48 L. Ed. 134; Railway v. Larabee Mills, 211 U. S. 612, 620, 29 Sup. Ct. 214, 53 L. Ed. 352) and the Constitution gives exclusive power to Congress to regulate commerce between the states (article 1, § 8), each being sovereign with respect to the objects committed to it (Chief Justice Marshall in McCulloch v. Maryland, 4 Wheat. *316, *410, 4 L. Ed. 579). While the Constitution and the laws made pursuant thereto are the supreme law of the land (Const. art. 6), nevertheless a state may legislate in a great variety of ways so as to affect interstate commerce and persons engaged in it without constituting a regulation of it within the meaning of that instrument. Sherlock v. Alling, 93 U. S. 99, 103, 23 L. Ed. 819.

[2] Cars, engines, and railroads are the instrumentalities by which transportation is effected between the states, and are, while so en-

gaged, within the power of Congress alone to regulate. Gloucester Ferry Co. v. Pennsylvania, 114 U. S. 196, 204, 5 Sup. Ct. 826, 29 L. Ed. 158; Second Employers' Liability Cases, 223 U. S. 1, 46, 47, 32 Sup. Ct. 169, 56 L. Ed. 327. The Ohio act and regulations in their operation necessarily impose a burden upon all common carriers using locomotives within the state; but the right of the states in the exercise of their police power to enact laws for the safety of their citizens has never been denied, because, as said by Justice Harlan in Missouri, K. & T. Ry. Co. v. Haber, 169 U. S. 613, 628, 18 Sup. Ct. 488, 42 L. Ed. 878:

"They have never surrendered the power to protect the public health, the public morals, and the public safety. * * *"

In cases numerous and of great variety of subject-matter the Supreme Court have reaffirmed this principle. The substance of it, as applied to railroads, is stated by Justice Brown in Louisville & Nashville R. R. Co. v. Kentucky, 161 U. S. 677, at page 702, 16 Sup. Ct. 714, at page 724 (40 L. Ed. 849):

"It has never been supposed that the dominant power of Congress over interstate commerce took from the States the power of legislation with respect to the instruments of such commerce, so far as the legislation was within its ordinary police powers. Nearly all the railways in the country have been constructed under state authority, and it cannot be supposed that they intended to abandon their power over them as soon as they were finished. The power to construct them involves necessarily the power to impose such regulations upon their operation as a sound regard for the interests of the public may seem to render desirable. In the division of authority with respect to interstate railways Congress reserves to itself the superior right to control their commerce and forbid interference therewith; while to the States remains the power to create and to regulate the instruments of such commerce, so far as necessary to the conservation of the public interests."

Pertinent illustrations, and there are many others, are found in Smith v. Alabama, 124 U. S. 465, 8 Sup. Ct. 564, 31 L. Ed. 508, in which a law of Alabama requiring railroad engineers to be examined touching their qualifications and to obtain a license was held valid, although the plaintiff in error ran an engine between Mobile, Ala., and Corinth, Miss.; Railway v. Alabama, 128 U. S. 96, 9 Sup. Ct. 28, 32 L. Ed. 352, in which a law of Alabama requiring of locomotive engineers the ability to distinguish between colors and to be examined relative thereto was held to be no interference with commerce between the states, although the engineers might be engaged in that service; N. Y., N. H. & H. R. R. Co. v. New York, 165 U. S. 628, 17 Sup. Ct. 418, 41 L. Ed. 853, in which a statute of New York regulating the heating of steam passenger cars was sustained, although the particular train involved in the litigation was engaged in interstate commerce; Railway Co. v. Arkansas, 219 U. S. 453, 31 Sup. Ct. 275, 55 L. Ed. 290, in which a statute of Arkansas regulating the number of men constituting a train crew operating trains passing within the state was held valid and applicable to trains carrying commerce between the states, and Hennington v. Georgia, 163 U. S. 299, 317, 318, 16 Sup. Ct. 1086, 1093 (41 L. Ed. 166), in which a law of Georgia, forbidding the running of freight trains on Sunday, neces-

sarily affected interstate commerce, but was sustained. In giving the reasons for that conclusion Justice Harlan, after discussing numerous cases, said:

"Local laws of the character mentioned have their source in the powers which the States reserved and never surrendered to Congress, of providing for the public health, the public morals and the public safety, and are not, within the meaning of the Constitution, and considered in their own nature, regulations of interstate commerce simply because, for a limited time or to a limited extent, they cover the field occupied by those engaged in such commerce. The statute of Georgia is not directed against interstate commerce. * * * Such a law, although in a limited degree affecting interstate commerce, is not for that reason a needless intrusion upon the domain of federal jurisdiction, nor strictly a regulation of interstate commerce, but, considered in its own nature, is an ordinary police regulation designed to secure the well-being and to promote the general welfare of the people within the State by which it was established, and, therefore, not invalid by force alone of the Constitution of the United States."

Many of the cases are collated by Justice Brewer in Missouri Pacific Ry. Co. v. Larabee Mills, 211 U. S. 612, 622, 623, 29 Sup. Ct. 214, 53 L. Ed. 352.

The decisions, the principle being expressed in various ways, show that when a state law enacted in the exercise of its police power affects interstate commerce only indirectly and incidentally, is passed in good faith and is not directed against interstate commerce, is an aid to commerce, does not go beyond the necessities of the case, and does not constitute an arbitrary or unreasonable interference with commerce between the states, is appropriate to and has a real substantial relation to an object as to which the state is competent to legislate, and does not conflict with the expressed or presumed will of Congress on the subject, it is invariably sustained. Sherlock v. Alling, 93 U. S. 99, 102, 23 L. Ed. 819; Smith v. Alabama, 124 U. S. 465, 482, 8 Sup. Ct. 564, 31 L. Ed. 508; Nashville, etc., R. R. Co. v. Alabama, 128 U. S. 96, 101, 9 Sup. Ct. 28, 32 L. Ed. 352; Western Union Tel. Co. v. James, 162 U. S. 650, 656, 16 Sup. Ct. 934, 40 L. Ed. 1105; Illinois Central R. R. Co. v. Illinois, 163 U. S. 142, 154, 16 Sup. Ct. 1096, 41 L. Ed. 107; Hennington v. Georgia, 163 U. S. 299, 303, 304, 317, 16 Sup. Ct. 1086, 41 L. Ed. 166; N. Y., N. H. & H. R. R. Co. v. New York, 165 U. S. 628, 631, 632, 17 Sup. Ct. 418, 41 L. Ed. 853; Railway v. Solan, 169 U. S. 133, 137, 138, 18 Sup. Ct. 289, 42 L. Ed. 688; M., K. & T. R. R. Co. v. Haber, 169 U. S. 613, 626, 627, 18 Sup. Ct. 488, 42 L. Ed. 878; Lake Shore, etc., Ry. Co. v. Ohio, 173 U. S. 285, 296, 297, 19 Sup. Ct. 465, 43 L. Ed. 702; Lake Shore, etc., Ry. Co. v. Smith, 173 U. S. 684, 688, 689, 19 Sup. Ct. 565, 43 L. Ed. 858; Cleveland, etc., Ry. Co. v. Illinois, 177 U. S. 514, 516, 517, 20 Sup. Ct. 722, 44 L. Ed. 868; Missouri & Pacific Ry. Co. v. Larabee Mills, 211 U. S. 612, 29 Sup. Ct. 214, 53 L. Ed. 352; Chicago, etc., Ry. Co. v. Arkansas, 219 U. S. 453, 465, 466, 31 Sup. Ct. 275, 55 L. Ed. 290; Southern Ry. Co. v. Reid, 222 U. S. 424, 435, 436, 32 Sup. Ct. 140, 56 L. Ed. 257; Second Employer's Liability Cases, 223 U. S. 1, 48, 49, 32 Sup. Ct. 169, 56 L. Ed. 327; Savage v. Jones, Indiana State Chemist, 225 U. S.

501, 32 Sup. Ct. 715, 56 L. Ed. 1182; Standard Stock Food Co. v. Wright, as State Food and Dairy Commissioner of Iowa, 225 U. S. 540, 32 Sup. Ct. 784, 56 L. Ed. 1197.

The Ohio law and regulations meet all of these requirements. As an inspection law also it was within the state's power to enact, although in its operation it subjected complainant's locomotive boilers to inspection (Patapsco Guano Co. v. Board of Agriculture, 171 U. S. 345, 354, 18 Sup. Ct. 862, 43 L. Ed. 191; Savage v. Jones, State Chemist of Indiana, supra; Standard Stock Food Co. v. Wright, as State Food and Dairy Commissioner of Iowa, supra), and it is settled that the state's power may be exercised through an administrative board (Atlantic Coast Line R. R. Co. v. North Carolina Commission, 206 U. |S. 1, 19, 27 Sup. Ct. 585, 51 L. Ed. 933, 11 Ann. Cas. 398). Therefore, while the state law stood alone all common carriers in Ohio were bound by its provisions and the regulations adopted under it. But, when Congress chose to provide for the inspection of boilers of locomotives used in interstate commerce, a new situation arose presenting for judicial decision two subjects closely related to each other; one involving the alleged conflict between the respective regulations, and the other having to do with the intention of Congress as disclosed by its legislation and by the regulations adopted by its authority in occupying the field of boiler inspection for locomotives engaged in commerce between the states. If the regulations do conflict, or if the federal regulations do occupy the whole field, the injunction prayed for must issue, as will be shown.

[3] The underlying principle applicable to both subjects was early announced. Chief Justice Marshall in McCulloch v. Maryland, 4 Wheat. *316, *426 (4 L. Ed. 579), said:

"This great principle is, that the constitution and the laws made in pursuance thereof are supreme; that they control the constitution and laws of the respective states, and cannot be controlled by them."

. Beginning with that case and down to Standard Stock Food Co. v. Wright, as State Food and Dairy Commissioner of Iowa, supra (June 10, 1912) 225 U. S. 540, 32 Sup. Ct. 784, 56 L. Ed. 1197, and through all the cases that principle is so established as to have become elementary. The whole matter of the relative authority of the two sovereignties when brought into question by conflicting or repugnant legislation is covered by the statement of Justice Hughes in Savage v. Jones, Indiana State Chemist (June 7, 1912) 225 U. S. 501, 524, 525, 32 Sup. Ct. 715, 722 (56 L. Ed. 1182).

"The State cannot, under cover of exerting its police powers, undertake what amounts essentially to a regulation of interstate commerce, or impose a direct burden upon that commerce [citing cases]. But when the local police regulation has real relation to the suitable protection of the people of the State, and is reasonable in its requirements, it is not invalid because it may incidentally affect interstate commerce, provided it does not conflict with legislation enacted by Congress pursuant to its constitutional authority [citing cases]."

The rule determining the nature of the conflict which shall render a state law inoperative, so far as it affects interstate commerce, de-

clared in Sinnot v. Davenport, 22 How. 227, 243 (16 L. Ed. 243), and never departed from in a long series of decisions, is, as in that case announced by Justice Nelson:

"We agree that, in the application of this principle of supremacy of an act of Congress in a case where the state law is but the exercise of a reserved power, the repugnance or conflict should be direct and positive, so that the two acts could not be reconciled or consistently stand together. When, therefore, an act of the Legislature of a state prescribes a regulation of the subject repugnant to and inconsistent with the regulation of Congress, the state law must give way; and this without regard to the source of power whence the state Legislature derived its enactment."

Recent decisions reaffirming this principle are found in Reid v. Colorado, 187 U. S. 137, 146, 147, 23 Sup. Ct. 92, 47 L. Ed. 108; Northern Pac. Ry. Co. v. Washington, 222 U. S. 370, 32 Sup. Ct. 160, 56 L. Ed. 237; Southern Ry. Co. v. Reid, 222 U. S. 424, 434, 436, 32 Sup. Ct. 140, 56 L. Ed. 257; Second Employer's Liability Cases, 223 U. S. 1, 55, 32 Sup. Ct. 169, 56 L. Ed. 327.

Is the state law with the state regulations in conflict with or in any way repugnant to the act of Congress and the federal regulations on the same subject? It is here that the character of the differences between the respective regulations determine whether there is a direct and positive repugnance or conflict of such character that the regulations cannot be reconciled or consistently stand together.

It will not be necessary to determine the nature of any other differences than those having to do with the drilling of telltale holes in stay bolts shorter than eight inches, and the time within which that work must be done (Ohio regulations V [e]; federal regulations 26, 27), and the time of filing and the contents of specification cards and the time of making the examinations and data required to be specified (Ohio regulations XII [a], [b]; federal regulations 54, and form for such cards), for the case may be disposed of upon a consideration of these. If the regulations on these subjects are compared, it will be seen that their respective provisions present direct conflicts. Both except entirely flexible bolts from the requirement of drilling telltale holes, and both require such drilling in other stay bolts, whether behind frames and braces or not, as are applied after September 1, 1910 (state regulation), or after July 1, 1911 (federal regulation). The state regulation provides for the drilling of telltale holes, which would include bolts applied prior to September 1, 1910, and also bolts behind frames and braces "when the locomotive is in the shop for heavy repairs or at other suitable opportunity," which work must be completed prior to January 1, 1912; while the federal regulation would include bolts applied prior to July 1, 1911, but would not include bolts behind frames and braces (these being expressly excepted) "when the locomotive is in the shop for heavy repairs," which work must be completed prior to July 1, 1914. If there is any question of importance in this case arising from the differences in time as affecting stay bolts applied after the certain respective dates specified, it is necessarily disposed of in the discussion of the effect of the difference in the dates, January 1, 1912, and July 1, 1914, to

which the necessity for completing the drilling of the holes in all bolts is postponed; but it is very clear that by the federal regulation rigid stay bolts behind frames and braces applied prior to July 1, 1911, are expressly excepted from the requirement of having the telltale holes drilled in them, thereby requiring a less degree of care, though very little less, as it appears, than the Ohio regulations. A compliance with the federal regulations would not, therefore, satisfy the Ohio regulations, and would subject the complainant to the state penalty for disobedience, even though he complied with the federal regulation. It is true that by the federal regulation there is no exception for rigid bolts behind frames and braces after July 1, 1911, but necessarily all such bolts applied to the locomotives before that date must by the state regulation have the telltale holes.

The time for making heavy repairs and the coincident drilling of the holes is not fixed, except by the Ohio regulations it must be done prior to January 1, 1912, and by the federal regulations prior to July 1, 1914. In other words, complainant has, under the federal regulation, two years and a half more time within which to prepare itself to meet the federal requirements than it had under the state regulation for doing this work. If it declines to acknowledge the state's authority, it becomes subject to penalty. The provisions for filing the specification cards containing the results of calculations made in determining the working pressure and other necessary data are substantially the same, and, where accurate drawings of boilers are available, the data may be taken from drawings, but by the Ohio regulations the cards must be completed and forwarded prior to March 1, 1911, and by the federal regulations prior to July 1, 1912. In cases in which accurate drawings are not available, the required data, by each regulation, must be obtained at the first opportunity when general repairs are made or when flues are removed, if their removal is necessary to enable the examination to be made; but the state act requires all examinations to be completed and cards filed prior to January 1, 1912, while the federal limitation of time is July 1, 1913. It appears that the examination required to be made where accurate drawings are not available involves dismembering the principal parts of the locomotive boilers, and that the operation on each locomotive requires large expense and much time, and necessarily withdraws the locomotive for as much time as may be necessary from active service. It will be observed that in neither of the regulations is any time fixed for making general repairs or removing flues; but it is clear that under the federal regulations a longer time within which to comply is granted than in the state regulations. The defendants minimize these differences, arguing that a compliance with the state regulations would be in preparation for compliance with the federal regulations, and a compliance with the former within the time limited by them would, therefore, be a compliance with the federal regulation.

This argument misses the point, for the question is not what complainant may do in order that it can, by its conduct, harmonize these regulations; but whether it must obey the state requirements when Congress has provided a different rule regulating its conduct. It is

clear that the state requirement for drilling telltale holes in the stay-bolts behind frames and braces is not a requirement of the federal regulations, and is therefore additional to them. There is a class of cases in which Congress and a state have each legislated respecting the same general subject-matter, and the state law included a subject as to which the federal act was silent. In these cases the state law was sustained, because, while the federal act operated in the same general field, yet it was silent as to the particular subject-matter embraced in the state legislation; in other words, Congress had not acted upon that particular subject-matter at all, and therefore the state could do so if it were a subject within its police power and affected interstate commerce only indirectly. Thus in Missouri, etc., Ry. Co. v. Haber, 169 U. S. 613, 18 Sup. Ct. 488, 42 L. Ed. 878, an act of Kansas relating to bringing diseased cattle into the state and authorizing a civil action to recover damages in favor of any person injured was held not to be overridden by the act of Congress known as the Animal Industry Act, or by certain other acts of Congress, because Congress had made no provision for a civil action, and that provision in the Kansas act was in aid of the objects Congress had in view, and was an exercise by the state of its police power to protect the people and redress their wrongs within its limits.

Reid v. Colorado, 187 U. S. 137, 23 Sup. Ct. 92, 47 L. Ed. 108, is such a case. This involved a statute of Colorado making it a misdemeanor for any one to bring into the state between April 1st and November 1st any cattle or horses from a state, territory, or county south of the thirty-sixth parallel, north latitude, unless they had been held at some place north of that parallel at least 90 days prior to importation, or unless the owner or person in charge should procure from the state veterinary sanitary board a certificate of health of the cattle or horses. The Animal Industry Act of Congress made it an offense for any one knowingly to take or send from one state into another any live stock infected with an infectious or communicable disease. It was held that the act did not make it an offense against the United States to ship from one state into another live stock which the shipper did not know were diseased. The offense provided by the Colorado statute consisted in not holding the cattle at some place north of the thirty-sixth parallel, and in not having procured a certificate of health, irrespective of the offender's knowledge, or want of it, of the health of the cattle or horses. In Savage v. Jones, Indiana State Chemist, 225 U. S. 501, 32 Sup. Ct. 715, 56 L. Ed. 1182, a citizen of Minnesota sought to restrain the state chemist of Indiana from taking proceedings to enforce an act of that state requiring a person who caused to be sold or offered for sale any concentrated commercial feeding stuff, to take the steps therein provided, particularly to file with the state chemist a statement containing, among other things, the ingredients composing the feeding stuff. This was held not to be in conflict with the national Food and Drugs Act, because, among other reasons, that act did not require any publication of the ingredients of any food or drug when a subject of interstate commerce. In holding that no ground appeared for denying the validity of the statute of Indi-

ana, Justice Hughes said (225 U. S. 539, 32 Sup. Ct. 728 [56 L. Ed. 1182]):

"That State has determined that it is necessary in order to secure proper protection from deception that purchasers of the described feeding stuffs should be suitably informed of what they are buying and has made reasonable provision for disclosure of ingredients by certificate and label, and for inspection and analysis. The requirements, the enforcement of which the bill seeks to enjoin, are not in any way in conflict with the provisions of the Federal act. They may be sustained without impairing in the slightest degree its operation and effect. There is no question here of conflicting standards, or of opposition of state to Federal authority."

The test, therefore, is not whether Congress has actually legislated upon the general subject; but the question has to do rather with the effect and character of its legislation and 'the end sought to be attained. The question is not whether the act of Congress operates upon the same subject-matter as the state act, but whether, from the nature of the subject-matter, congressional action leaves room without a conflict for the operation of the state law in the same field.

The distinction is clear between such cases as those involving diseased cattle legislation and the case of the Indiana state chemist on the one hand, and those cases on the other in which the character of the state act is such that in carrying out its provisions a conflict must necessarily arise in determining the rights of the individual engaged in interstate commerce, who, if the state act operates imperatively upon him, becomes subject to its penalties, although as to the act complained of under the state law he has a sanction for under the act of Congress. Such a case was Sinnot v. Davenport, 22 How. 227, 241 (16 L. Ed. 243), which involved an act of Alabama making certain requirements of owners of steamboats navigating the waters of that state. It was held invalid so far as it was brought to bear upon a vessel which had taken out a license, and was duly enrolled under the act of Congress for carrying on the coasting trade, and plying between New Orleans and the city of Montgomery, Ala. The act of Congress regulating the coasting trade required a compliance with many conditions by the owners of vessels before obtaining enrollment or license. Concerning these, Justice Nelson said:

"These are the guards and restraints, and the only guards and restraints, which Congress has seen fit to annex to the privileges of ships and vessels engaged in the coasting trade, and upon a compliance with which, as we have seen, as full and complete authority is conferred by the license to carry on the trade as Congress is capable of conferring."

A like conclusion was reached in Harman v. Chicago, 147 U. S. 396, 13 Sup. Ct. 306, 37 L. Ed. 216, in which an ordinance of Chicago exacting a license fee for tugs towing vessels in the Chicago river was involved. The protesting owner of tugs engaged in interstate commerce sued to recover the license fee he had been compelled to pay. The decision against him in the state courts was reversed in the Supreme Court of the United States.

[5] The fact being established that Congress has not required the railroads to drill telltale holes in all rigid bolts shorter than eight inches wherever located, the requirement by the state that such holes shall be

drilled in rigid bolts behind frames and braces imposes a duty on the railroads engaged in interstate commerce from which they are exempted by the regulations under the federal act. Congress, as it were, licenses the railroads to use rigid bolts behind frames and braces without drilling telltale holes in them. The state requires the railroads to do something more with respect to stay bolts than Congress requires —something additional, not in the sense of an additional subject-matter, though related to the same general subject of legislation, but something additional to the very subject-matter upon which Congress has expressly legislated. It was established long ago that a state cannot legislate by way of complement of or in augmentation of the legislation of Congress with respect to the same subject-matter. Houston v. Moore, 5 Wheat. 1, *21, *22, 5 L. Ed. 19; Prigg v. Pennsylvania, 16 Pet. *539, *618, 10 L. Ed. 1060.

Here the direct effect of the state requirement is to compel the complainant to a course of conduct relative to its interstate locomotives from which it is excused by the federal requirement, and forces it to abandon the right to act in accordance with the requirements of the paramount power, or subject itself to the penalty for disobedience of the state regulations. In this respect, at least, the case differs from that class of decisions to which Railroad Co. v. Kansas, 216 U. S. 262, 30 Sup. Ct. 330, 54 L. Ed. 472, and Railroad Co. v. Siler (C. C.) 186 Fed. 176, 197 et seq. (6 Cir.) belong. In these compliance by the carrier with requirements made by state legislation under established power affecting local conditions involved an expense or loss if the carrier chose to·continue to run interstate trains in the one case, and in the other to adhere to rates theretofore fixed for that traffic. In the Kansas case the State Railroad Commission ordered the railroad to put passenger·train service in operation on its road between Madison, Kan., and the Missouri-Kansas state line. The railroad company operated interstate trains on that road. At the state line there were no terminal facilities, these being in Missouri, some 20 miles beyond, and it would be inconvenient and expensive to build adequate facilities at the state line. The railroad's claims that the order in effect was a direct burden on interstate commerce because it required the stopping of interstate trains at the state line, and because, the expense of establishing facilities at that point being great, the railroad, in order to avoid that expense, must operate the passenger service through to its terminals beyond the state line, was held untenable, because the order did not direct the stopping of interstate trains at the state line, and because the operation of·local passenger trains beyond that line was at the mere election of the railroad company. "Besides," said Justice White (216 U. S. 284, 30 Sup. Ct. 338, 54 L Ed. 472), "even if the performance of the duty of furnishing adequate local facilities in some respects affected interstate commerce, it does not necessarily result that thereby a direct burden on interstate commerce would be imposed."

In the case in this circuit, the railroad's interstate rates filed by it with the Interstate Commerce Commission comprised the sum of its local rates in Kentucky and adjoining northern states. The Kentucky

Railroad Commission under established powers changed the local rates in Kentucky. The railroad's claim was that interstate business conditions in that part of Kentucky would not justify a reduction of the rates established for that traffic, and a compliance with the order lowering the local rates would, if they were adopted by the railroad as its interstate rate, result in a loss to the railroad in carrying interstate commerce; and adherence to the old interstate rate, to which it had the right to adhere, would necessarily result in a cessation of that kind of traffic. But it was held that the act of the Commission did not bear directly upon interstate rates; that the loss resulting from the business necessity to which the railroad was subjected of reducing its interstate rate in order to hold that business was but the remote and incidental effect of the Commission's order which in itself did not bear directly upon the subject, and was, therefore, in no sense a regulation of it; that the incidental effect of the order was to cause the carrier to reduce its interstate rates, if, for business reasons, it elected to do so, and it was shown that (186 Fed. 200):

"The logic of the company's argument would release its local rates from governmental regulation altogether; for the United States could not fix the local rates, because they are local, and the state could not change them, because it would thereby cast a direct burden on interstate commerce."

Such conclusion was held untenable, as it was also in the Kansas case in which the railroad's argument led to an escape from all regulations, state or federal.

In these cases enforced obedience to the state mandate did not involve a compulsory abandonment of a right the complainant in each had under the Constitution and laws of the United States. They could forego that right if they elected to do so, but they were not by the exercise of the state's power forced to forego it. In this case the Ohio regulations take away from the complainant the constitutional right to regulate its conduct in accordance with the command of the paramount power. In the contrasted cases a change of complainants' conduct with respect to interstate traffic, if they chose to make it, would be the direct result of their own business reasons, and not of any compulsion imposed by the requirement of state legislation passed under recognized state power. There was in them a lack of connection between the moving force and the incidental result, and there was, therefore, an absence of that "privity between the manifestation of the power and the resulting burden," of which then Associate Justice White speaks in his dissenting opinion in the Northern Securities Case, 193 U. S. 197, 395, 24 Sup. Ct. 436, 485 (48 L. Ed. 679). In this case the enforcement of the state regulations is the denial of complainant's constitutional right to be governed by the requirements of the federal regulations. In these respects the contrasted cases and this case differ radically in principle. The rule may be deduced from all of the cases that a state act necessarily by its requirements bringing about a conflict with the requirements of an act of Congress on the same subject produces that direct interference with interstate commerce which is not permissible. Since these regulations do conflict in the manner shown with respect to telltale holes in bolts behind frames and braces, the conclusion must

be that the state regulation constitutes a direct interference with interstate commerce.

[4] The difference in the time provided by the two regulations within which the carrier must comply with the requirements of each as to the drilling of telltale holes and the filing of the specification cards presents another reason why the complainant cannot be compelled to obey the state regulations. The mere fact that such obedience within the time fixed might involve inconvenience to the common carrier whose instrumentalities of commerce might be affected, even though serious in character, is not important if the state act was a proper exercise of its reserved power. N. Y., N. H. & H. R. R. Co. v. New York, 165 U. S. 628, 632, 633, 17 Sup. Ct. 418, 41 L. Ed. 853; Chicago, etc., Ry. Co. v. Arkansas, 219 U. S. 453, 464, 31 Sup. Ct. 275, 55 L. Ed. 290. But Congress and the authority constituted by its legislation have seen fit to give to the carriers a certain time within which the really serious requirements may be complied with. There may be no convenient time for general repairs of some of the complainant's locomotives before the time limited by the state regulations, whether it be the drilling of telltale holes or obtaining the necessary data by dismembering the locomotives and making the required examinations of the boilers. The federal regulations indicate what shall be a sufficient compliance with respect to time. This leaves no opportunity for the state to establish any other measure of time. Authority to the point is found in Nor. Pac. Ry. Co. v. Washington, 222 U. S. 370, 32 Sup. Ct. 160, 56 L. Ed. 237, which involved the "Hours of Service" Act of Congress, approved March 4, 1907 (Act March 4, 1907, c. 2939, 34 Stat. 1415 [U. S. Comp. St. Supp. 1911, p. 1321]), but not to take effect until March 4, 1908; and an act of the state of Washington of June 12, 1907 (Laws 1907, c. 20). The acts were much alike. The railroad company was engaged in hauling merchandise from points outside of the state destined to points within the state, and from points within the state to points in British Columbia, as well as in carrying merchandise which had originated outside of the state and was in transit through the state to foreign destination. The train may also have been carrying some local freight. The company permitted some of the train crew to remain on duty more than 16 consecutive hours and proceedings were instituted in the state court to recover penalties for the violation of the state law on that subject. The right to do so was sustained by the Supreme Court of that state on the sole ground that the state act preceded the congressional act in point of time of effective operation, and therefore until the act of Congress had taken effect at the date prescribed it was competent for the state to make a regulation for the hours of service of employés on railroad trains moving within the state, and to apply such regulations to a train engaged in interstate commerce. But the Supreme Court of the United States (222 U. S. 379, 380, 32 Sup. Ct. 161, 56 L. Ed. 237) took a different view, Chief Justice White saying (the court considering the issue as one requiring merely the interpretation of the statute):

" * * * We are of opinion that it becomes manifest that it would cause the statute to destroy itself to give to the clause postponing its operation for

one year the meaning which must be affixed to it in order to hold that during the year of postponement state police laws applied. In the first place, no conceivable reason has been, or we think can be, suggested for the postponing provision if it was contemplated that the prohibitions of state laws should apply in the meantime. This is true because if it be that it was contemplated that the subject dealt with should be controlled during the year by state laws, the postponement of the prohibitions of the act could accomplish no possible purpose. This is well illustrated by this case, where, by the ruling below, a state regulation substantially similar to that contained in the act of Congress is made applicable. In the second place, the obvious suggestion is that the purpose of Congress in giving time was to enable the necessary adjustments to be made by the railroads to meet the new conditions created by the act, a purpose which would of course be frustrated by giving to the provision as to postponement a significance which would destroy the very reason which caused it to be enacted."

The defendants urge a distinction, however, between the "Hours of Service" case and theirs, in that in the former the federal statute was passed March 4, 1907, and was not to take effect until March 4, 1908, and the claimed violation of the law occurred about a month after the state law became effective, June 12, 1907, while in the instant case the state law, approved May 20, 1910, was to take effect September 1, 1910, and the regulations under it were adopted August 11, 1910, while the act of Congress passed February 17, 1911, was not to take effect until July 1, 1911, and the regulations under it being adopted June 2, 1911. In other words, the state law was passed and took effect before the federal law. Of course, so long as Congress was silent, the state law spoke effectively and complainant complied with its regulations, but, when the orders of Congress were given to regulate interstate commerce in a certain way, the state no longer had any voice in the matter, and complainant refused further compliance. "It is elementary, * * *" says Chief Justice White, Railway Co. v. Washington, supra, 222 U. S. 378, 32 Sup. Ct. 161, 56 L. Ed. 237, "that the right of a State to apply its police power for the purpose of regulating interstate commerce, in a case like this, exists only from the silence of Congress on the subject, and ceases when Congress acts on the subject or manifests its purpose to call into play its exclusive power. This being the conceded premise upon which alone the state law could have been made applicable, it results that as the enactment by Congress of the law in question was an assertion of its power, by the fact alone of such manifestation that subject was at once removed from the sphere of the operation of the authority of the State. To admit the fundamental principle and yet to reason that because Congress chose to make its prohibitions take effect only after a year, the matter with which Congress dealt remained subject to state power, is to cause the act of Congress to destroy itself; that is, to give effect to the will of Congress as embodied in the postponing provision for the purpose of overriding and rendering ineffective the expression of the will of Congress to bring the subject within its control—a manifestation arising from the mere fact of the enactment of the statute." From this it follows that Congress having given the complainant until July 1, 1914, to drill the telltale holes required, and until July 1, 1912, to file its specification cards in cases where accurate drawings

of the boilers were available, and until July 1, 1913, to make the necessary examinations when such drawings are not available, the state had no power to compel the complainant to do any of these things after the federal regulations were adopted, June 2, 1911.

This leads to a consideration of a class of cases to which the case just cited really belongs illustrative of the far-reaching power of Congress in regulating interstate commerce, and establishing the want of any power in the states to even indirectly and incidentally affect interstate commerce by their legislation, when Congress in the exercise of its power has, by the language of its enactment, or from the nature of the subject-matter, shown an intention to exercise its exclusive power over such commerce by occupying the whole field presented by the subject-matter.

Preliminary to a discussion of these cases it may be well to refer to the effect upon a state's legislation which, were it not for congressional action, would be permitted as only an indirect and incidental interference with interstate commerce, when, by such action, a conflict is precipitated between the two sovereignties. In such case the congressional legislation will "supersede" any state action on the subject (Railway v. Alabama, 128 U. S. 96, 99, 9 Sup. Ct. 28, 32 L. Ed. 352), or the state law will be operative until "displaced" by congressional legislation (N. Y., N. H. & H. R. R. Co. v. New York, 165 U. S. 628, 632, 17 Sup. Ct. 418, 41 L. Ed. 853). "Undoubtedly," says Justice Harlan, "Congress in its discretion, may take entire charge of the whole subject of the equipment of interstate cars, and establish such regulations as are necessary and proper for the protection of those engaged in interstate commerce." Railway v. Arkansas, 219 U. S. 453, 466, 31 Sup. Ct. 275, 279 (55 L. Ed. 290). And the same learned justice says that when the "entire subject" is one upon which Congress constitutionally may legislate and has legislated, and has devised a system for dealing with it, "all local or State regulations in respect of such matters and covering the same ground will cease to have any force, whether formally abrogated or not; * * *" Reid v. Colorado, 187 U. S. 137, 146, 147, 23 Sup. Ct. 92, 96 (47 L. Ed. 108). And again, as applying to such rights as complainant acquired under the act of Congress he said (187 U. S. 151, 23 Sup. Ct. 97, 47 L. Ed. 108):

"* * * The acknowledged police powers of a State cannot legitimately be exerted so as to defeat or impair a right secured by the National Constitution, any more than to defeat or impair a statute passed by Congress in pursuance of the powers granted to. it."[1]

In Gulf, etc., Ry. Co. v. Hefley, 158 U. S. 98, 104, 15 Sup. Ct. 802, 804 (39 L. Ed. 910), a Texas statute making it unlawful for a railroad company to charge a greater sum for transporting freight than that specified in the bill of lading was held, when applied to freight transported into the state, to be in conflict with the Interstate Commerce

[1] Indeed, the question may be said to be one of individual rights under the Constitution, rather than one of conflict of powers. Justice Washington in Houston v. Moore, 5 Wheat. 1, *22 (5 L. Ed. 19).

Act, making it unlawful for a railroad to charge and collect a greater or less compensation than that specified in its published schedule of rates. Justice Brewer, after referring to many cases in which state acts, local in character, had been sustained by reason of the absence of congressional legislation, said:

"Generally it may be said in respect to laws of this character that, though resting upon the police power of the State, they must yield whenever Congress, in the exercise of the powers granted to it, legislates upon the precise subject-matter, for that power, like all other reserved powers of the states, is subordinate to those in terms conferred by the Constitution upon the nation."

The language of these decisions foreshadows the specific declarations by the Supreme Court of the extent of power possessed by Congress when by its legislation it shows an intention to cover the entire field embraced by the subject-matter of its laws affecting interstate commerce. Perhaps the most far-reaching decision is Southern Railway Co. v. United States, 222 U. S. 20, 32 Sup. Ct. 2, 56 L. Ed. 72, in which it was held that the Safety Appliance Act (Act March 2, 1893, c. 196, 27 Stat. 531 [U. S. Comp. St. 1901, p. 3174]), imposing the duty upon every common carrier "engaged in interstate commerce by railroad" of equipping all trains, locomotives, and cars used on its lines in moving interstate traffic with designated appliances calculated to promote the safety of that traffic and of employés, and forbidding "any such common carrier" to haul or permit to be hauled or used on its line of railroad any car "used in moving interstate traffic," not equipped with automatic couplers capable of being coupled and uncoupled without the necessity of a man going between the ends of the cars, embraced all locomotives, cars, and similar vehicles used on any railroad that was a highway of interstate commerce, and this was so, although three cars in a train of five cars transporting interstate commerce were loaded with local freight only. The objection that the act directly affected intrastate commerce with respect to the three cars engaged in that traffic was met by showing that the absence of the couplers on those cars was a menace to that train and to others, and because the power of Congress was not exerted to regulate intrastate commerce as such, but, as said by Justice Van Devanter (222 U. S. 27, 32 Sup. Ct. 4, 56 L. Ed. 72):

"* * * because its power to regulate interstate commerce is plenary and competently may be exerted to secure the safety of the persons and property transported therein and of those who are employed in such transportation, no matter what may be the source of the dangers which threaten it. That is to say, it is no objection to such an exertion of this power that the dangers intended to be avoided arise, in whole or in part, out of matters connected with intrastate commerce."

Clearly here was a subject always held to be within the exclusive power of the states to directly regulate and yet the manifest purpose of Congress to provide for the safety of persons and property when they were the subject of interstate commerce made the law of Congress paramount to any reserved power the state might have touching the instrumentalities carrying commerce solely within its limits.

In Southern Ry. Co. v. Reid, 222 U. S. 424, 32 Sup. Ct. 140, 56 L. Ed. 257, a statute of North Carolina required railroads to receive freight for transportation whenever tendered at a regular station and to forward the same by a route selected by the person tendering the freight under a penalty to the aggrieved party for its refusal. Upon a tender of freight to be routed as designated by the shipper from a point in North Carolina to a point in West Virginia, no through rates having as yet been made or filed with the Interstate Commerce Commission, the agent refused the freight, and, after the establishment of the rate within a few days, received and transported the freight. The freight was the subject of interstate commerce, yet under the local act the railroad must obey. On the other hand, it could make no interstate shipment under the interstate commerce act unless its through rate had been filed and published, as required by the Interstate Commerce Act, or had been fixed at the time the freight was tendered. In the opinion the inquiry was put by Justice McKenna (222 U. S. 437, 32 Sup. Ct. 143, 56 L. Ed. 257):

"Does it [the Interstate Commerce Act] * * * take control of the subject-matter and impose affirmative duties upon the carriers which the State cannot even supplement? In other words, has Congress taken possession of the field?"

And he answers the question by saying (222 U. S. 440, 32 Sup. Ct. 144, 56 L. Ed. 257):

"There is scarcely a detail of regulation which is omitted to secure the purpose to which the Interstate Commerce Act is aimed. It is true that words directly inhibitive of the exercise of state authority are not employed, but the subject is taken possession of."

And again (222 U. S. 442, 32 Sup. Ct. 144, 56 L. Ed. 257):

"The power of Congress to so provide [fix rates for interstate commerce] cannot be doubted. If the regulation be not exclusive, this situation is presented: If the carrier obey the state law, he incurs the penalties of the Federal law. If he obey the Federal law, he incurs the penalties of the state law. Manifestly one authority must be paramount, and when it speaks the other must be silent. We can see no middle ground."

It was therefore held that the railroad company could not be compelled to receive the freight, the state laws to the contrary notwithstanding, until through rates had been established.

Second Employer's Liability Cases, 223 U. S. 1, 32 Sup. Ct. 169, 56 L. Ed. 327, involved the act of Congress providing that every common carrier by railroad while engaged in interstate commerce should be liable in damages to any person suffering injury while he was employed by such carrier in such commerce. It made provision for recovery in case of injury or death, whether the injury or death resulted in whole or in part from the negligence of any of the officers, agents, or employés of such carrier, or by reason of any defect or insufficiency; due to its negligence, in its cars, engines, appliances, machinery, track, roadbed, works, boats, wharves, or other equipment. The rule of contributory negligence was modified materially, and also the rule of assumption of risk. The case decides, among other things, notwithstanding the rules of the common law relative to contributory

negligence and assumption of risk and although the same end at which Congress was aiming, namely, the safety of employés engaged in interstate commerce, was the subject of legislation in the several states, that the whole field, so far as interstate commerce was concerned, was covered by the act of Congress, and it therefore superseded all rules of the common law and all the laws of all the states directed to the same end sought to be attained by the act. Justice Van Devanter said (223 U. S. 51, 32 Sup. Ct. 175, 56 L. Ed. 327):

"We are not unmindful that that end [to impel the carriers to avoid or prevent negligent acts and omissions which are made the bases of the rights of recovery which the statute creates and defines] was being measurably attained through the remedial legislation of the several States, but that legislation has been far from uniform, and it undoubtedly rested with Congress to determine whether a national law, operating uniformly in all the States upon all carriers by railroad engaged in interstate commerce, would better subserve the needs of that commerce. The Lottawanna, 21 Wall. 558, 581, 582 [22 L. Ed. 654]; Baltimore & Ohio R. R. v. Baugh, 149 U. S. 368, 378, 379 [13 Sup. Ct. 914, 37 L. Ed. 772]."

And again (223 U. S. 54, 55, 32 Sup. Ct. 177, 56 L. Ed. 327):

"True, prior to the present act the laws of the several States were regarded as determinative of the liability of employers engaged in interstate commerce for injuries received by their employés while engaged in such commerce. But that was because Congress, although empowered to regulate that subject, had·not acted thereon, and because the subject is one which·falls within the police power of the States in the absence of action by Congress. Sherlock v. Alling, 93 U. S. 99 [23 L. Ed. 819]; Smith v. Alabama, 124 U. S. 465, 473, 480, 482 [8 Sup. Ct. 564, 31 L. Ed. 508]; Nashville, etc., Ry. Co. v. Alabama, 128 U. S. 96, 99 [9 Sup. Ct. 28, 32 L. Ed. 352]; Reid v. Colorado, 187 U. ·S. 137, 146 [23 Sup. Ct. 92, 47 L. Ed. 108]. The inaction of Congress, however, in no wise affected its power over the subject. The Lottawanna, 21 Wall. 558, 581 [22 L. Ed. 654]; Gloucester Ferry Co. v. Pennsylvania, 114 U. S. 196, 215 [5 Sup. Ct. 826, 29 L. Ed. 158]. And now that Congress has acted, the laws of the States, in so far as they cover the same field, are superseded, for necessarily that which is not supreme must yield to that which is. Gulf, Colorado & Santa Fé Railway Co. v. Hefley, 158 U. S. 98, 104 [15 Sup. Ct. 802, 39 L. Ed. 910]; Southern Railway Co. v. Reid, 222 U. S. 424 [32 Sup. Ct. 140, 56 L. Ed. 257]; Northern Pacific Railway Co. v. Washington, 222 U. S. 370 [32 Sup. Ct. 160, 56 L. Ed. 237]."

It will be observed that in none of these cases did the act of Congress expressly declare an intention of occupying the whole field or especially prohibit state action relative to the same subject-matter, or forbid joint occupancy in the field Congress chose to occupy. But such inhibition is not necessary. In Southern Railway Co. v. Reid & Beam, 222 U. S. 444, 447, 32 Sup. Ct. 145, 146 (56 L. Ed. 263), Justice McKenna, says:

"We have shown in the opinion in No. 487 [222 U. S. 424 (32 Sup. Ct. 140, 56 L. Ed. 257), Southern Ry. Co. v. Reid], that there need not be directly inhibitive congressional legislation,' but congressional legislation which occupies the field of regulation and thereby excludes action by the state. Northern Pacific Ry. Co. v. State of Washington [222 U. S. 370 (32 Sup. Ct. 160, 56 L. Ed. 237)]."

When the national boiler inspection act and its title and regulations, under it, and the state boiler inspection act and its title and the regulations under it, are considered, it is manifest that both Congress and

the State were providing through their legislation and authorized instrumentalities and regulations, each in its respective field, a complete and elaborately detailed scheme of equipment of locomotives with safe and suitable boilers and appurtenances thereto; and a comparison of the two shows differences in what may seem unimportant details, but the consequences of which cause the state regulations, in at least the respects discussed, to infringe the rights of the complainant as a common carrier using locomotives engaged solely in commerce between the states. But both acts and regulations show the evident purpose of the state, on the one hand, and Congress on the other, to completely cover the field embraced by the purposes of each. The federal regulations fixing minimum requirements is equivalent to a declaration to interstate carriers that no more are necessary. So far as interstate commerce is concerned, Congress has clearly asserted its undoubted power to cover the whole field of boiler inspection by appropriate legislation and regulations of uniform application in all of the States, and has by so doing superseded the legislation and regulations of the State of Ohio so far as they may affect the complainant's locomotives. To the immediate point and as controlling the question, the remarks of Justice Hughes in Savage v. Jones, Indiana State Chemist, 225 U. S. 501, 533, 32 Sup. Ct. 715, 726 (56 L. Ed. 1182), may be quoted:

"* * * When the question is whether a Federal act overrides a state law, the entire scheme of the statute must of course be considered and that which needs must be implied is of no less force than that which is expressed. If the purpose of the act cannot otherwise be accomplished—if its operation within its chosen field else must be frustrated and its provisions be refused their natural effect—the state law must yield to the regulation of Congress within the sphere of its delegated power. Texas & Pacific Ry. Co. v. Abilene Cotton Oil Co., 204 U. S. 426 [27 Sup. Ct. 350, 51 L. Ed. 553, 9 Ann. Cas. 1075]; Northern Pacific Ry. Co. v. Washington, supra; Southern Ry. Co. v. Reid, supra."

The necessities of this case do not require an expression of opinion whether the Supreme Court of Ohio in Railway Co. v. State, 82 Ohio St. 60, 91 N. E. 869, 137 Am. St. Rep. 758, entertain views inconsistent with the views of the Supreme Court of the United States as expressed in many of their decisions.

The conclusion is, and under the decisions of the Supreme Court of the United States must necessarily be, that the Ohio act and the regulations adopted in pursuance of its provisions involved in this case are clearly in contravention of the Constitution of the United States, so far as they are applied, or are sought to be applied, to the complainant and its locomotives, and therefore that the complainant is entitled to the interlocutory injunction prayed for in its bill.

An order appropriate to that end may be taken.