# REID *v.* COLORADO.

## ERROR TO THE SUPREME COURT OF THE STATE OF COLORADO.

### No. 269. Argued October 24, 1902.—Decided December 1, 1902.

The transportation of live stock from State to State is a branch of interstate commerce and any specified rule or regulation in respect of such transportation, which Congress may lawfully prescribe or authorize and which may properly be deemed a regulation of such commerce, is paramount throughout the Union.

When the entire subject of the transportation of live stock from one State to another is taken under direct national supervision and a system devised by which diseased stock may be excluded from interstate commerce, all local or State regulations in respect of such matters and covering the same ground will cease to have any force, whether formally abrogated or not; and such rules and regulations as Congress may lawfully prescribe or authorize will alone control. The power which the States might thus exercise may in this way be suspended until national control is abandoned and the subject be thereby left under the power of the States.

The act of Congress of May 29, 1884, 23 Stat. 31, c. 60, known as the Animal Industry Act, does not cover the whole subject of the transportation of live stock from one State to another.

The statute of Colorado of March 21, 1885, relating to the introduction of infectious or contagious diseases among the cattle and horses of that State, relates to matters not covered by the Animal Industry Act of Congress, and is not in violation of the Constitution of the United States.

No one is given by the Constitution of the United States the *right* to introduce into a State, against its will, live stock affected by a contagious, infectious or communicable disease, and whose presence in the State will or may be injurious to its domestic animals. The State—Congress not having assumed charge of the matter as involved in interstate commerce—may protect its people and their property against such dangers, taking care always that the means employed to that end do not go beyond the necessities of the case or unreasonably burden the exercise of privileges secured by the Constitution of the United States.

The Colorado statute is not inconsistent with the clause of the Constitution declaring that the citizens of each State shall be entitled to all privileges and immunities of citizens in the several States; for it is applicable alike to the citizens of all the States.

The principle is universal that legislation, whether by Congress or by a State, must be taken to be valid, unless the contrary is made clearly to appear.

THE case is stated in the opinion of the court.

*Mr. John H. Denison* and *Mr. William M. Springer* for plaintiff in error.

*Mr. Frederic D. McKenney* for defendant in error. *Mr. Charles C. Post*, attorney general of the State of Colorado, was with him on the brief.

MR. JUSTICE HARLAN delivered the opinion of the court.

The plaintiff in error was convicted in the District Court of Arapahoe County, Colorado, and sentenced to confinement for six months in the county jail for a violation of the second section of a statute enacted March 21, 1885, to prevent the introduction of infectious or contagious diseases among the cattle and horses of that State. Sessions Laws, Col. 1885, p. 335.

The judgment was affirmed by the Supreme Court of the State, and the case having been brought here, it is insisted that by the final judgment the accused has been denied a right specially claimed by him under the Constitution of the United States.

This position depends upon the inquiry whether a certain act of Congress, to be presently referred to, has the scope and effect attributed to it by the accused, and, that contention failing, whether the statute under which he was convicted is repugnant to that instrument.

After reciting that certain infectious and contagious diseases, known as the Texas or splenetic fever, Spanish itch and other diseases of a dangerous and contagious nature, were prevalent among cattle and horse stock in the States and Territories south of the 36th parallel of north latitude, and that it was essential for the protection of the cattle and horses of Colorado to prevent the introduction and spread of all such diseases within that State, the above statute provided :

" § 1. It shall be unlawful for any person, association or corporation, to bring or drive, or cause to be brought or driven, into this State any cattle or horses having an infectious or

contagious disease, or which have been herded, or brought into contact, with any other cattle or horses laboring under such disease, at any time within ninety days prior to their importation into this State.

" § 2. It shall be unlawful for any person, association or corporation, to bring or drive, or cause to be brought or driven, into this State, between the first day of April and the first day of November, any cattle or horses from a State, Territory or county south of the 36th parallel of north latitude, unless said cattle or horses have been held at some place north of the said parallel of latitude for a period of at least ninety days prior to their importation into this State, or unless the person, association or corporation, owning or having charge of such cattle or horses, shall procure from the State Veterinary Sanitary Board a certificate, or bill of health, to the effect that said cattle or horses are free from all infectious or contagious diseases and have not been exposed, at any time within ninety days prior thereto, to any of said diseases. The expense of any inspection connected herewith to be paid by the owner or owners of such cattle or horses.

" § 3. Any person violating the provision of this act shall be deemed guilty of a misdemeanor, and shall, on conviction, be punished by a fine of not less than five hundred dollars ($500), nor more than five thousand dollars ($5000), or by imprisonment in the county jail for a term of not less than six months, and not exceeding three years, or by both such fine and imprisonment.

" § 4. If any person, association or corporation shall bring, or cause to be brought, into this State, any cattle or horses, in violation of the provisions of sections one or two of this act, or shall, by false representation, procure a certificate of health, as provided for in section two of this act, he or they shall be liable, in all cases, for all damages sustained on account of disease communicated by or from said cattle or horses ; judgment for damages in any such case, together with the costs of action, shall be a lien upon all such cattle and horses, and a writ of attachment may issue in the first instance without the giving of a bond, and the court rendering such judgment may order the sale of said cattle or horses, or so many thereof as

may be necessary to satisfy said judgments and costs. Such sale shall be conducted as other sales under execution." Session Laws, Col. 1885, p. 335.

There was no proof in the case that the particular cattle in question had any dangerous, infectious or contagious disease. But it did appear that after being kept a long while in Lubbock and Cochran Counties, Texas, south of the 36th parallel of north latitude, these cattle were shipped on the 20th day of June, 1901, to Denver, Colorado, on their way to their ultimate destination in Wyoming, without being first inspected as required by the statute of the former State. The provisions of the Colorado statute were ignored altogether as invalid legislation. Being asked by one of the witnesses whether he had or not allowed the State Board of Sanitary Inspection to inspect the cattle, or whether or not he had procured from the State Veterinary Sanitary Board a certificate or bill of health to the effect that the cattle were free from all infectious or contagious diseases, the defendant said: "That the State Board of Sanitary Inspection, through one of their inspectors, had inspected the cattle against his will and desire, but that he had not obtained from the board any certificate or bill of health whatsoever. But he said that he immediately theretofore had had the cattle inspected by a duly authorized inspector of the Bureau of Animal Industry of the United States, at Hereford, in the State of Texas, and had obtained a certificate from him to the effect that the same were free from any infectious or contagious disease ; that the reason he could not get a certificate or bill of health from the State Board of Colorado was because he would not pay the expense of such inspection, and because he had opposed such inspection as unnecessary and without any warrant in law."

When refusing his assent to the State inspection Reid showed to the State authorities what he called a "United States certificate."

The certificate was signed by "Arthur C. Hart, Ass't Inspector, Bureau of Animal Industry." That officer certified that he had carefully inspected the cattle in question at Hereford, Texas, and found them "free from Texas or splenetic fever in-

fection (*Boophilus bovis*), or any other infectious or contagious disease," and that "no Texas fever infection is known to exist where they have been kept or on the trail over which they have passed." . Below the signature of the Assistant Inspector was the following unsigned printed memorandum : " Animals which have been inspected and certified by an inspector of the U. S. Bureau of Animal Industry, and are free from disease, have the right to go into any State and be sold for any purpose, without further inspection or the exaction of fees."

The above, together with certain published regulations prepared and issued by the Bureau of Animal Industry, was all the evidence in the case.

The defendant asked the court to instruct the jury :

That it was unnecessary for the defendant to procure from the Colorado Veterinary Sanitary Board a certificate or bill of health to the effect that his cattle were free from infectious or contagious diseases, and had not been exposed at any time within ninety days prior thereto, to any of said diseases, for the reason that the cattle had previously been inspected, "according to the statute of the United States in such case made and provided, and according to the rules and regulations pursuant to said statute, promulgated by the Department of Agriculture, by a duly authorized inspector of the Bureau of Animal Industry of the United States, stationed at Hereford, in the State of Texas, and had been duly certified by such United States inspector to be free from any infectious or contagious disease; and for the further reason that he, the said defendant, then and there exhibited and showed to the said State inspector of Colorado the said inspection certificate of the United States to said cattle ;" and,

That the Colorado statute, approved March 21, 1885, and under which defendant was prosecuted, was repugnant to the provision of the Constitution of the United States giving Congress power to regulate commerce among the States, as well as to the provision declaring that the citizens of each State shall be entitled to all the privileges and immunities of citizens in the several States, and was null and void, as imposing unnecessary and unlawful burdens and restrictions upon interstate commerce.

The court refused to so instruct the jury, but instructed them that if they believed from the evidence, beyond a reasonable doubt, that the defendant did, on or about the 20th day of June, 1901, that is, between the first day of April and the first day of November of that year, "unlawfully bring or drive or cause to be brought or driven into the State of Colorado, and into the county of Arapahoe, the cattle as mentioned in the information or any part thereof, from certain counties south of the 36th parallel, north latitude, and that said cattle had not been held theretofore at some place north of said parallel of latitude, for a period of at least ninety days prior to the importation of said cattle into said State of Colorado, and that the said defendant had not procured from the State Veterinary Sanitary Board of Colorado a certificate or bill of health, to the effect that said cattle were free from infectious or contagious diseases, and to the effect that the same had not been exposed at any time within ninety days prior thereto to any of said diseases, and that then and there the said defendant did refuse and decline to procure or permit any one for him to procure such certificate or bill of health, and did refuse and decline to pay or allow, or suffer or permit any one for him to pay the expense of any inspection so as by the act prescribed, then and in that event it is your duty to find the defendant guilty as charged in this information."

The contention here of the defendant is substantially that the subject of the transportation of cattle from one State to another has been so far covered by the act of Congress known as the Animal Industry Act of May 29, 1884, 23 Stat. 31, c. 60, that, after its passage, no enactment by the State upon the same subject was permissible; and that even in the absence of legislation by Congress the Colorado statute is invalid, in that, by its natural or necessary operation, it unreasonably obstructs that freedom of commerce among the States which the Constitution established. These questions are recognized by the court as of great importance and have received its most careful consideration.

Taking up the first branch of the defendant's contention, let us look at the controlling provisions of the above act of Con-

gress and ascertain whether that statute has the scope and effect claimed for it.

The statute is entitled "An act for the establishment of a Bureau of Animal Industry, to prevent the exportation of diseased cattle, and to provide means for the suppression and extirpation of pleuro-pneumonia and other contagious diseases among domestic animals."

By the first section the Commissioner of Agriculture is directed to organize in his Department a Bureau of Animal Industry, to appoint a chief thereof, who shall be a competent veterinary surgeon, and whose duty it shall be "to investigate and report upon the condition of the domestic animals of the United States, their protection and use, and also inquire into and report the causes of contagious, infectious, and communicable diseases among them, and the means for the prevention and cure of the same, and to collect such information on these subjects as shall be valuable to the agricultural and commercial interests of the country." § 1.

By the second section the Commissioner is authorized to appoint two competent agents, practical stock raisers or experienced business men familiar with questions pertaining to commercial transactions in live stock, whose duty it shall be, under the instructions of the Commissioner, "to examine and report upon the best methods of treating, transporting, and caring for animals, and the means to be adopted for the suppression and extirpation of contagious pleuro-pneumonia, and to provide against the spread of other dangerous contagious, infectious, and communicable diseases." § 2.

The third section makes it "the duty of the Commissioner of Agriculture to prepare such rules and regulations as he may deem necessary for the speedy and effectual suppression and extirpation of said diseases, and to certify such rules and regulations to the executive authority of each State and Territory, and invite said authorities to coöperate in the execution and enforcement of this act." And "whenever the plans and methods of the Commissioner of Agriculture shall be accepted by any State or Territory in which pleuro-pneumonia or other contagious, infectious, or communicable disease is declared to exist,

or such State or Territory shall have adopted plans and methods for the suppression and extirpation of said diseases, and such plans and methods shall be accepted by the Commissioner of Agriculture, and whenever the governor of a State or other properly constituted authorities signify their readiness to co-operate for the extinction of any contagious, infectious, or communicable disease in conformity with the provisions of this act, the Commissioner of Agriculture is hereby authorized to expend so much of the money appropriated by this act as may be neces-sary in such investigations, and in such disinfection and quaran-tine measures as may be necessary to prevent the spread of the disease from one State or Territory into another." § 3.

In order " to promote the exportation of live stock from the United States," the Commissioner was directed to " make special investigation as to the existence of pleuro-pneumonia, or any contagious, infectious, or communicable disease, along the dividing lines between the United States and foreign countries, and along the lines of transportation from all parts of the United States to ports from which live stock are exported, and make report of the results of such investigation to the Secretary of the Treasury, who shall, from time to time, establish such regulations concerning the exportation and transportation of live stock as the results of said investigations may require;" § 4; and that " to prevent the exportation from any port of the United States to any port in a foreign country of live stock affected with any contagious, infectious, or communicable dis-ease, and especially pleuro-pneumonia," the Secretary of the Treasury was authorized to take such steps and adopt such measures, not inconsistent with the provisions of the act, as he might deem necessary. § 5.

By another section of the act all railroad companies within the United States, or the owners or masters of any steam or sailing vessel or other vessel or boat, were forbidden to receive for transportation or transport from one State or Territory to another, or from any State into the District of Columbia, or from the District into any State, " any live stock affected with any contagious, infectious, or communicable disease, and es-pecially the disease known as pleuro-pneumonia; nor shall

any person, company, or corporation deliver for such transportation to any railroad company, or master or owner of any boat or vessel, any live stock, *knowing* them to be affected with any contagious, infectious, or communicable disease ; nor shall any person, company, or corporation drive on foot or transport in private conveyance from one State or Territory to another, or from any State into the District of Columbia, or from the District into any State, any live stock, *knowing* them to be affected with any contagious, infectious, or communicable disease, and especially the disease known as pleuro-pneumonia : *Provided,* That the so-called splenetic or Texas fever shall not be considered a contagious, infectious, or communicable disease within the meaning of sections four, five, six and seven of this act, as to cattle being transported by rail to market for slaughter, when the same are unloaded only to be fed and watered in lots on the way thereto." § 6.

Other provisions of the act are as follows :

"§ 7. That it shall be the duty of the Commissioner of Agriculture to notify, in writing, the proper officials or agents of any railroad, steamboat, or other transportation company doing business in or through any infected locality, and by publication in such newspapers as he may select, of the existence of said contagion ; and any person or persons operating any such railroad, or master or owner of any boat or vessel, or owner or custodian of or person having control over such cattle or other live stock within such infected district, who shall knowingly violate the provisions of section six of this act, shall be guilty of a misdemeanor, and, upon conviction, shall be punished by a fine of not less than one hundred nor more than five thousand dollars, or by imprisonment for not more than one year, or by both such fine and imprisonment.

"§ 8. That whenever any contagious, infectious, or communicable disease affecting domestic animals, and especially the disease known as pleuro-pneumonia, shall be brought into or shall break out in the District of Columbia, it shall be the duty of the Commissioners of said District to take measures to suppress the same promptly and to prevent the same from spreading; and for this purpose the said Commissioners are

hereby empowered to order and require that any premises, farm, or farms where such disease exists, or has existed, be put in quarantine; to order all or any animals coming into the District to be detained at any place or places for the purpose of inspection and examination; to prescribe regulations for and to require the destruction of animals affected with contagious, infectious, or communicable disease, and for the proper disposition of their hides and carcasses; to prescribe regulations for disinfection, and such other regulations as they may deem necessary to prevent infection or contagion being communicated, and shall report to the Commissioner of Agriculture whatever they may do in pursuance of the provisions of this section.

"§ 9. That it shall be the duty of the several United States district attorneys to prosecute all violations of this act which shall be brought to their notice or knowledge by any person making the complaint under oath; and the same shall be heard before any District or Circuit Court of the United States or territorial court holden within the district in which the violation of this act has been committed." 23 Stat. 31, c. 60.

It may be here stated that by the act of February 9, 1889, the Department of Agriculture was made one of the Executive Departments of the Government, and placed under the supervision and control of a Secretary of Agriculture, 25 Stat. 659, c. 122; and that by the act of July 14, 1890, the Secretary was vested with all the authority which by the above act of May 29, 1884, was conferred upon the Commissioner of Agriculture, 26 Stat. 282, 288, c. 707.

It is quite true, as urged on behalf of the defendant, that the transportation of live stock from State to State is a branch of interstate commerce and that any specified rule or regulation in respect of such transportation, which Congress may lawfully prescribe or authorize and which may properly be deemed a regulation of such commerce, is paramount throughout the Union. So that when the entire subject of the transportation of live stock from one State to another is taken under direct national supervision and a system devised by which diseased stock may be excluded from interstate commerce, all

local or State regulations in respect of such matters and covering the same ground will cease to have any force, whether formally abrogated or not; and such rules and regulations as Congress may lawfully prescribe or authorize will alone control. *Gibbons* v. *Ogden*, 9 Wheat. 1, 210; *Morgan* v. *Louisiana*, 118 U. S. 455, 464; *Hennington* v. *Georgia*, 163 U. S. 299, 317; *N. Y., N. H. & H. R. R. Co.* v. *New York,* 165 U. S. 628, 631; *Missouri, Kansas & Texas Railway Co.* v. *Haber*, 169 U. S. 613, 626; *Rasmussen* v. *Idaho*, 181 U. S. 198, 200. The power which the States might thus exercise may in this way be suspended until national control is abandoned and the subject be thereby left under the police power of the States.

But the difficulty with the defendant's case is that Congress has not by any statute covered the whole subject of the transportation of live stock among the several States, and, except in certain particulars not involving the present issue, has left a wide field for the exercise by the States of their power, by appropriate regulations, to protect their domestic animals against contagious, infectious and communicable diseases.

An examination of the Animal Industry Act will make this entirely clear. Three distinct subjects are embraced by that act. One is the ascertainment through the Agricultural Department of the condition of the domestic animals of the United States, the causes of contagious, infectious or communicable diseases affecting them, the best methods for treating, transporting and caring for animals, the means to be adopted for the suppression and extirpation of such diseases, particularly that of contagious pleuro-pneumonia, and to collect such information on those subjects as will be valuable to the agricultural and commercial interests of the country. Congress did not assume to declare that " the rules and regulations " which that Department might adopt as necessary " for the speedy and effectual suppression and extirpation of said diseases " should have in themselves, or apart from the action of a State, any binding force upon the States. They were to be certified to the executive authority of each State, and the coöperation of such authorities in executing the act of Congress invited. If the authorities of any State

adopted the plans and methods devised by the Department, or if the State authorities adopted measures of their own which the Department approved, then the money appropriated by Congress could be used in conducting the required investigations and in such disinfection and quarantine measures as might be necessary to prevent the spread of the diseases in question from one State or Territory into another. Congress did not intend to override the power of the States to care for the safety of the property of their peoples by such legislation as they deemed appropriate. It did not undertake to invest any officer or agent of the Department with authority to go into a State and without its assent take charge of the work of suppressing or extirpating contagious, infectious or communicable diseases there prevailing and which endangered the health of domestic animals. Nor did Congress give the Department authority by its officers or agents to inspect cattle within the limits of a State and give a certificate that should be of superior authority in that or other States, or which should entitle the owner to carry his cattle into or through another State without reference to the reasonable and valid regulations which the latter State may have adopted for the protection of its own domestic animals. It should never be held that Congress intends to supersede or by its legislation suspend the exercise of the police powers of the States, even when it may do so, unless its purpose to effect that result is clearly manifested. This court has said—and the principle has been often reaffirmed—that " in the application of this principle of supremacy of an act of Congress in a case where the State law is but the exercise of a reserved power, the repugnance or conflict should be direct and positive, so that the two acts could not be reconciled or consistently stand together." *Sinnot* v. *Davenport*, 22 How. 227, 243. The certificate given to the defendant by Assistant Inspector Hart of the Bureau of Animal Industry was in itself without legal weight in Colorado. As said in *Missouri, Kansas & Texas Railway Company* v. *Haber*, above cited : " While the States were invited to coöperate with the General Government in the execution and enforcement of the act, whatever power they had to protect their domestic cattle against such diseases was left untouched and un-

impaired by the act of Congress." Hence, it was decided in that case that the Animal Industry Act did not stand in the way of the State of Kansas enacting a statute declaring that any person driving, shipping or transporting, or causing to be shipped, driven or transported into or through that State, any cattle liable or capable of communicating Texas or splenetic fever to domestic cattle should be liable to the person injured thereby for all damages sustained by reason of the communication of said disease or fever, to be recovered in a civil action. We there held that the Kansas statute did nothing more than establish a rule of civil liability, in that State, affected no regulation of interstate commerce that Congress had prescribed or authorized, and impaired no right secured by the National Constitution.

Another subject embraced by the act of Congress related to the exportation from ports of the United States to ports in foreign countries of live stock affected with contagious, infectious or communicable diseases, especially pleuro-pneumonia; and in relation to that matter the Secretary of the Treasury was authorized to take such steps and adopt such measures not inconsistent with the act of Congress, as he deemed necessary. As the present case is not one of the exportation of live stock to a foreign country, it is unnecessary to consider what power, if any, remained with the States, after the passage of the Animal Industry Act, to suppress or extirpate diseases that in fact affected live stock, which it was the purpose of the owners to export.

Still another subject covered by the act is the driving on foot or transporting from one State or Territory into another State or Territory, or from any State into the District of Columbia, or from the District into any State, of any live stock *known* to be affected with any contagious, infectious or communicable disease. But this provision does not cover the entire subject of the transporting or shipping of diseased live stock from one State to another. The owner of such stock, when bringing them into another State, may not know them to be diseased; but they may, in fact, be diseased, or the circumstances may be such as fairly to authorize the State into which

they are about to be brought to take such precautionary measures as will reasonably guard its own domestic animals against danger from contagious, infectious or communicable diseases. The act of Congress left the State free to cover that field by such regulations as it deemed appropriate, and which only incidentally affected the freedom of interstate commerce. Congress went no farther than to make it an offence against the United States for any one *knowingly* to take or send from one State or Territory to another State or Territory, or into the District of Columbia, or from the District into any State, live stock affected with infectious or communicable disease. The Animal Industry Act did not make it an offence against the United States to send from one State into another live stock which the shipper did not know were diseased. The offence charged upon the defendant in the State court was not the introduction into Colorado of cattle that he knew to be diseased. He was charged with having brought his cattle into Colorado from certain counties in Texas, south of the 36th parallel of north latitude, without said cattle having been held at some place north of said parallel of latidude for at least the time required prior to their being brought into Colorado, and without having procured from the State Veterinary Sanitary Board a certificate or bill of health to the effect that his cattle—in fact—were free from all infectious or contagious diseases, and had not been exposed at any time within ninety days prior thereto to any such diseases, but had declined to procure such certificate or have the inspection required by the statute. His knowledge as to the actual condition of the cattle was of no consequence under the State enactment or under the charge made.

Our conclusion is that the statute of Colorado as here involved does not cover the same ground as the act of Congress and therefore is not inconsistent with that act; and its constitutionality is not to be questioned unless it be in violation of the Constitution of the United States, independently of any legislation by Congress. The latter question we now proceed to examine.

Certain principles are well settled by the former decisions of this court. One is that the purpose of a statute, in whatever language it may be framed, must be determined by its natural

and reasonable effect. *Henderson* v. *Mayor of New York,* 92 U. S. 259, 268. Another is, that a State may not, by its police regulations, whatever their object, unnecessarily burden foreign or interstate commerce. *Railroad Company* v. *Husen,* 95 U. S. 465, 472. Again, the acknowledged police powers of a State cannot legitimately be exerted so as to defeat or impair a right secured by the National Constitution, any more than to defeat or impair a statute passed by Congress in pursuance of the powers granted to it. *Gibbons* v. *Ogden,* 9 Wheat. 1, 210; *Missouri, Kansas & Texas Railway Co.* v. *Haber,* 169 U. S. 613, 625, 626, and authorities cited.

Now, it is said that the defendant has a right under the Constitution of the United States to ship live stock from one State to another State. This will be conceded on all hands. But the defendant is not given by that instrument the *right* to introduce into a State, against its will, live stock affected by a contagious, infectious or communicable disease, and whose presence in the State will or may be injurious to its domestic animals. The State—Congress not having assumed charge of the matter as involved in interstate commerce—may protect its people and their property against such dangers, taking care always that the means employed to that end do not go beyond the necessities of the case or unreasonably burden the exercise of privileges secured by the Constitution of the United States.

Is the statute of Colorado liable to the objection just stated? Can the courts hold that upon its face it unreasonably obstructs the exercise of the general right secured by the Constitution to ship or send recognized articles of commerce from one State to another without interference by local authority? Those questions must be answered in the negative. The Colorado statute, in effect, declares that live stock coming, between the dates and from the territory specified, are, ordinarily, in such condition that their presence in the State may be dangerous to its domestic animals; and hence the requirement that before being brought or sent into the State they shall either be kept at some place north of the 36th parallel of north latitude for at least ninety days prior to their importation into the State, *or* the owner must procure from the State Veterinary Sanitary Board

a certificate or bill of health that the cattle are free from all infectious or contagious diseases, and have not been exposed to any of said diseases at any time within ninety days prior thereto. As there is no evidence in the case as to the practical operation of this regulation upon shippers of cattle, as it does not appear otherwise than that the statute can be obeyed without serious embarrassment or unreasonable cost, the court cannot assume arbitrarily that the State acted wholly without authority or that it unduly burdened the exercise of the privilege of engaging in interstate commerce. The accused seems to have been content to rest his defence upon such grounds as arose upon the face of the local statute, without reference to any evidence bearing upon the reasonableness or unreasonableness of the particular methods adopted by the State to protect its domestic animals. He seems to have been willing to risk the case upon the simple proposition—based upon the words of the State enactment and upon the act of Congress, reinforced by certain regulations made by the Agricultural Department—that the local statute was inconsistent with that act, and with the general power of Congress to regulate interstate commerce.

As, therefore, the statute does not forbid the introduction into the State of *all* live stock coming from the defined territory—that diseased as well as that not diseased—but only prescribes certain methods to protect the domestic animals of Colorado from contact with live stock coming from that territory between certain dates, and as those methods have been devised by the State under the power to protect the property of its people from injury, and do not appear upon their face to be unreasonable, we must, in the absence of evidence showing the contrary, assume that they are appropriate to the object which the State is entitled to accomplish.

One other objection to the Colorado statute must be noticed, namely, that it is inconsistent with the clause of the Constitution declaring that the citizens of each State shall be entitled to all privileges and immunities of citizens in the several States. This position is untenable. The statute is equally applicable to citizens of all the States. No discrimination is shown. No privileges are granted to citizens of Colorado that are denied

to citizens of other States. *Kimmish* v. *Ball,* 129 U. S. 217, 222.

The principle is universal that legislation, whether by Congress or by a State, must be taken to be valid, unless the contrary is made clearly to appear ; and as the contrary does not so appear, the statute of Colorado is to be taken as a constitutional exercise of the power of the State.

Perceiving no error in the judgment to the prejudice of the plaintiff under the Constitution of the United States, the judgment is

*Affirmed.*

MR. JUSTICE BREWER dissented from the opinion and judgment of the court.