## PECOS & N. T. RY. CO. v. HALL. *
(No. 1032.)

(Court of Civil Appeals of Texas. Amarillo. Oct. 18, 1916. On Motion for Rehearing, Nov. 22, 1916.)

1. COMMERCE ⬥10—CONCURRENT POWERS OF STATE.

Where the federal and state governments have concurrent power, and the federal govern-

ment is inactive, the state's power may be executed.

[Ed. Note.—For other cases, see Commerce, Cent. Dig. § 8; Dec. Dig. ⬥10.]

2. COMMERCE ⬥8—INTERSTATE SHIPMENT— LIVE STOCK.

The federal government's power as to interstate shipments is paramount, and, when the interstate transportation of live stock is taken under direct federal supervision and a system devised by which diseased stock may be excluded from interstate commerce, any state regulations in respect thereto cease to have any force, and the acts of Congress and the regulations thereunder will alone control.

[Ed. Note.—For other cases, see Commerce, Cent. Dig. § 5; Dec. Dig. ⬥8.]

3. CARRIERS ⬥206 — INTERSTATE SHIPMENT OF LIVE STOCK—STATUTE—DAMAGES.

Under Act Cong. March 3, 1905, c. 1496, §§ 1, 3, 4, 33 Stat. 1264 (U. S. Comp. St. 1913, §§ 8701, 8703, 8704), and the express provision of a federal quarantine regulation adopted thereunder, cattle which had been exposed to disease, might, without inspection, be shipped as uninspected exposed cattle for immediate slaughter from quarantined territory to slaughtering centers in another state, where separate pens are provided for yarding exposed cattle, so that a carrier, refusing to accept them for shipment unless they were dipped, was liable in damages for the consequent shrinkage and injury.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 916, 917; Dec. Dig. ⬥206.]

4. APPEAL AND ERROR ⬥725(1) — ASSIGNMENTS OF ERROR—EXCLUSION OF EVIDENCE.

Where there was no assignment as to the sustaining of the demurrers to an answer, assignments as to the exclusion of the paragraphs of a contract set up in the answer were wholly abstract and inapplicable.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 3002, 3003, 3005; Dec. Dig. ⬥725(1).]

Appeal from District Court, Potter County; Hugh L. Umphres, Judge.

Action by J. F. Hall against the Pecos & Northern Texas Railway Company. Judgment for plaintiff, and defendant appeals. Affirmed.

Terry, Cavin & Mills, of Galveston, and Madden, Trulove, Ryburn & Pipkin, of Amarillo, for appellant. R. R. Hazlewood and J. Marvin Jones, both of Amarillo, for appellee.

HENDRICKS, J. The appellee, Hall, in the fall of 1913, contracted for 496 head of cattle from Warren & Son, to be delivered to him on or before November 1st, at Bovina, Tex.; said station being on the line of the appellant railway, and said cattle to be delivered for the purpose of shipment to the open market. On the 14th day of October he ordered from the chief dispatcher of the appellant in Amarillo, Tex., cars for the purpose of shipping said cattle, who agreed to furnish the cars at Bovina on the 24th of October. Appellee's trade with Warren & Son, with reference to the purchase and delivery of said cattle, was that the same were to be cut in the pens at their pasture, five miles from Bovina, on the morning of the

24th. The agent (Lucas) of the Pecos & Northern Texas Railway Company at Bovina refused to furnish the cars for the transportation of the cattle until said cattle were dipped and a permit issued. The cattle were exposed to a disease known as "scabies"; but the appellee testified that under his contract he was not to receive any cattle infected with such disease, and did not receive any cattle so infected.

On account of the action of the railway company, in refusing to furnish the cars, and its insistence that the cars would not be furnished or the cattle shipped unless the same were dipped, the cattle were not brought in or tendered for shipment on the 24th of October, but were held on the ranch of Warren & Son, and there dipped in compliance with the railway's demand. The particular cattle were specifically purchased by Hall, for the purpose of shipment to the open markets of Kansas City and St. Joseph, Mo., and were fat cattle, eligible for that purpose. The cattle were dipped twice, with tobacco dip, and on account of the handling and dipping of the same a resultant shrinkage and injury to said cattle produced damage which the jury assessed at $4,460.69.

It was impracticable for the appellee, after having been informed that this particular railroad would not ship his cattle, except under the conditions as stated, to take the cattle to any other railroad for the purpose of shipment, it being 100 miles to another road over which they could have been shipped to market, which would have required a week to have driven said cattle to that point. Bailey and Parmer counties, in the state of Texas, in which said cattle were located, were at the time in a quarantined territory, on account of the disease known as "scabies," the quarantine having been effectuated by a regulation and promulgation of the state authorities, as well as the federal Bureau of Animal Industry. The particular shipment was interstate, and hence, as applied to the immediate "transportation," the regulations, hereafter shown, promulgated by the Bureau of Animal Industry of the Department of Agriculture, if applicable, will control.

It is assigned and argued that neither under the regulations of the Bureau of Animal Industry, nor the state law and the regulations of the Live Stock Sanitary Commission, was the plaintiff entitled to recover. The last act affecting this subject passed by Congress on March 3, 1905, is entitled:

"An act to enable the Secretary of Agriculture to establish and maintain quarantine districts, to permit and regulate the movement of cattle and other live stock therefrom, and for other purposes." 33 Statutes at Large, 1264, United States Compiled Statutes, 1913, § 8701.

Section 1 of this act provides:

"That the Secretary of Agriculture is authorized and directed to quarantine any state," or portion thereof, "when he shall determine the fact that cattle or other live stock" therein "are affected by any contagious, infectious, or communicable disease," etc.

A railroad company is prohibited from receiving for transportation any live stock from any quarantined state, or quarantined portion of any state, except as provided in the act. Section 3 of the act provides for the promulgation of rules and regulations by the Secretary of Agriculture, permitting a method and manner of inspection, delivery, and shipment of cattle from such quarantined territory, "when the public safety will permit." Section 4 of said act provides:

"That cattle or other live stock may be removed from a quarantined state * * * under and in compliance with the rules and regulations of the Secretary of Agriculture, made and promulgated in pursuance of the provisions of section 3 of this act; but it shall be unlawful to move * * * any cattle or other livestock from an quarantined state * * * or quarantined portion of any state * * * into any other state, * * * in manner or method or under conditions other than those prescribed by the Secretary of Agriculture."

A part of regulation 21 of the federal quarantine regulations is as follows:

"Cattle not visibly diseased, but which may be a part of a diseased herd, may, without inspection, be shipped interstate as 'uninspected exposed cattle' for immediate slaughter from points in the quarantined area to any recognized slaughtering center where separate pens are provided for yarding exposed cattle," etc.

As stated, these cattle were to be shipped to St. Joe and Kansas City, where, according to the testimony, the facilities mentioned were provided for the reception of the character of cattle purchased. We do not think it is necessary to prolong this opinion with a reproduction, and an analysis, of the state law and the Live Stock Sanitary Commission's regulations urged by appellant as a defense to appellee's cause of action.

There is some controversy, in the condition of the testimony, whether any of the particular cattle were actually infected with the disease designated as "scabies." Hall's trade, however, with Warren & Son, was that he was not to accept any diseased cattle. He had a "10 per cent. cut" on all spayed heifers purchased by him, and if we read the record correctly, on October 23d, there were 695 head of "Mule Shoe" cattle dipped (owned by Warren & Son), and only 6 head of that number, as testified to by appellant's own witness Keeliehor, were affected with the particular disease. Appellee, who saw the cattle prior to the time of the dipping, and thereafter at the pens preparatory to shipment, testified that none of his cattle were affected with scabies, though it is uncontradicted that the same had been exposed to the disease.

[1, 2] It is, of course, the general rule that, where the federal and state government have concurrent power, if the federal government is inactive, the state's power may be executed; the corollary to this, however, is that the government's power is paramount, and it is the rule that, when the subject of the trans-

portation of live stock from one state to another is taken under direct national supervision, and a system devised by which diseased stock may be excluded from interstate commerce, any state regulations in respect of such matters will cease to have any force. The acts of Congress and the regulations thereunder will alone control. Reid v. Colorado, 187 U. S. 137, 146, 23 Sup. Ct. 92, 47 L. Ed. 108. The veterinary inspector, Jones, testified:

"When I told the agent (meaning Lucas, the local agent at Hereford) that Hall had a right to ship these cattle as exposed cattle, he contended all the time that he would not accept them without a certificate or a permit."

[3] We are clear that the shipper had the right to pen and ship these cattle under the regulations of the Bureau of Animal Industry from Bovina to the open market for immediate slaughter, without the demand and the exaction by the railway company for the dipping (and certificate to that effect) of said cattle; and as applied to shipment for immediate slaughter, regarding the cattle as uninspected exposed cattle, the railroad company had no legal justification to make such a demand and refuse to furnish the cars for transportation, invoking any rule or regulation under the so-called authority of the state government.

Rule 20 of the Live Stock Sanitary Commission of Texas prescribes that cattle held in certain counties (including the two counties where these cattle were situated) shall not be moved from the pastures where cattle were located for any purpose whatsoever without a permit issued by a duly authorized inspector; and said rule further prescribes that:

No cattle shall be tendered for inspection for "interstate" movement situated in the quarantined area, "unless the owner of said cattle is in possession of a certificate, signed by an inspector, * * * stating that the owner of the cattle so tendered has complied with the state laws, rules, and regulations of this commission, and that his range and cattle are free of infection."

We will not attempt to solve the question whether or not, after the Bureau of Animal Industry and the state had interdicted the same territory—the former, however, permitting nondiseased cattle, though exposed, to be shipped—the person moving said cattle (excluding the act of penning and shipping) would be guilty of a violation of the state law. We, however, think that, so far as any preliminary movement of the particular cattle is concerned, even if the state has a right to prohibit the same as between the state and the owner, the railroad, under the national act and the rules and regulations of the Bureau of Animal Industry, would have the right to ship said cattle after same had been penned for transportation; and as an agent of interstate commerce and as a common carrier it would be its duty to do so, because

the national act, and the regulations under its authority, authorized it. To that extent, at least, the state law is superseded, and the question of its enforcement in other respects, as to the actual transportation of the cattle, is between the state and the citizen.

We are unable to infer from the record that Jones advised the agents of the railway company that they had a right to demand that the cattle should be dipped as a prerequisite to an interstate shipment. He said:

"I told him [the agent] that according to the state regulation they could not come from the ranch without dipping, but according to the federal regulations they were entitled to go as uninspected exposed cattle for immediate slaughter. I do not remember just exactly what he said when I told him he had a right to ship these cattle as exposed cattle."

Neither do we infer from the record that the inspector demanded of the purchaser or the vendor of the particular cattle that said cattle had to be dipped as a prerequisite to any movement. The only testimony is that the inspector sent word by certain parties who were going to the ranch where the cattle were situated:

"That the agent would not receive the cattle unless they had a permit. I also stated [to them] that I would not issue a permit unless the cattle were dipped."

All assignments and propositions affecting the question of the sanitary regulations, interposed as a justification for the refusal to furnish the cars, and the consequent dipping of said cattle, are overruled.

[4] The seventh and eighth assignments of error, in the condition of the record, present only abstract questions, and are unnecessary to discuss on the merits. Portions of the live stock contract were pleaded by the defendant railway company, asserting that the written agreement merged all prior understandings concerning the furnishing of cars, facilities for shipment, and the transportation of the stock. It is also pleaded that the contract provided that notice of a claim for damages for injury to the stock occurring during the transportation thereof, or previous to loading the same for shipment, would be given in writing to either of certain designated officers before the stock should be removed from the place of destination. The court sustained exceptions to these pleadings, and at the trial the defendant railway company offered such contracts in evidence, to which it was objected that there were no pleadings to sustain the same, and that they were immaterial and irrelevant.

There is no assignment challenging the action of the court in sustaining the demurrers to the answer, however erroneous that action may be; hence the assignments questioning the court's action in excluding the paragraphs of the contract as evidence are wholly abstract, and inapplicable to the merits of the case. After the court had sustained exceptions to the answer, unless he revoked his

action in that respect, he could not have done otherwise than exclude the testimony.

The judgment is affirmed.

### On Motion for Rehearing.

Aside from the assignments based upon the court's rejection of certain provisions in the live stock contract, appellant's assignments are as follows:

(1) The court erred in refusing a peremptory instruction.

(2) "The main charge of the court is erroneous in submitting any issues of fact to the jury, since a peremptory instruction for defendant should have been given, because," etc.

(3) "The verdict of the jury is contrary to the law and the evidence, in that under the law the facts of this case show no liability upon the part of the defendant, because," etc.

(4) "Paragraph 1 of the court's charge is erroneous, in submitting to the jury the issue as to whether or not plaintiff was the owner of the cattle alleged in his petition," etc.

(5) "The court erred in paragraph 1 of its charge, in submitting to the jury the issue as to whether or not the defendant, through its agent, announced that it would not transport plaintiff's cattle from Bovina, to Kansas City and St. Joseph, Mo., nor permit them to be placed in the pens at Bovina, nor loaded on the cars at said point, without their first being dipped, without a certificate or permit, because the same is upon the weight of the evidence, * * * and because a mere announcement by defendant's agent would not authorize the plaintiff to act thereon," etc.

(6) "The court erred in excluding as evidence, and instructing the jury not to consider, the rules and regulations of the Live Stock Sanitary Commission of Texas, and in withdrawing them from the jury."

The trial court charged the jury in part as follows:

"If you find and believe from the evidence that plaintiff was the owner of the cattle alleged in his petition, and that same were uninspected exposed cattle, and that they were not infected with scabies or other communicable disease, and that from defendant plaintiff ordered cars in which, on October 24, 1913, to transport such cattle from Bovina, Tex., to Kansas City and St. Joseph, Mo., for immediate slaughter, and that defendant, though its agent, before the time for such transportation, announced that it would not receive and so transport such cattle, and would not permit them to be placed in the pens or loaded on the cars without they were first dipped, or without a certificate or permit, and that such announcement, if any, of defendant was made known or in any way communicated to plaintiff, and that the only lawful way by which such permit or certificate could be obtained was for such cattle to be dipped, and that in compliance with such announcement, if any, plaintiff caused such cattle to be dipped, and that the same sustained the injuries, or any of them, alleged in plaintiff's petition, and that the proximate cause of such injuries, if any, was the dipping of such cattle, then you will find for plaintiff and assess his damage, unless you find for defendant under other instructions given you."

He also instructed the jury that if they believed the defendant's agent Lucas did not announce that he would not permit plaintiff's cattle to enter defendant's pens, or to be loaded on defendant's cars, or that said cattle would not be transported by defendant, unless they were accompanied by a permit, but that such statements were voluntarily made to R. V. Moorhead by the inspector, L. L. Jones, either in person or by sending such information by some other person, without having been so directed or advised by defendant's agent, John Lucas, to find for the defendant. He also directed the jury, if they believed that the cattle in question were visibly diseased with scabies, to likewise find for the defendant.

With the exception of the peremptory instruction, there were none presented to the trial court by the defendant, at least none brought forward into the brief, upon any theory or phase of the evidence exonerating the railway company. Additional to the testimony of Jones, shown in the original opinion, who was both state and federal inspector, as to his communication to appellant's agent in regard to Hall's right to ship these particular cattle, the statement of facts contains the following by Jones:

"When I told the agent that Hall had a right to ship these cattle as exposed cattle, he contended all the time that he would not accept them without a certificate or a permit."

Moorhead had charge of the ranch of Warren & Son, who were to deliver the cattle purchased by Hall at Bovina, with a "10 per cent. cut." Moorhead says that, in addition to a message from Jones, he telephoned to Lucas, the agent at Bovina, who positively informed him that he would not receive these cattle for shipment, nor even let him pen the same until they were dipped, and that he then telephoned to Hall, the purchaser of the cattle.

We necessarily infer that the jury believed that Jones, as federal inspector, informed Lucas, the agent, that under the federal regulations these particular cattle, purchased by Hall, had the right to go to Kansas City, Mo., for immediate slaughter. If under the federal regulations a permit for that purpose was necessary to be issued by Jones, it inferentially follows that Jones, as federal inspector, would have issued such a document. It also follows, we think, logically, that the agent had no right to refuse to receive uninspected, clean cattle in the pens at Bovina for shipment for immediate slaughter at Kansas City and St. Joseph, Mo., unless the same were dipped. We infer that Jones, as state inspector, would not have issued a permit for the movement of these cattle from Warren & Son's ranch to the stock pens, but also conclude that, if a permit were necessary, he would have issued one as federal inspector, permitting the movement of the cattle to Kansas City and St. Joe, Mo., for the open market for immediate slaughter. To the extent of the movement of the particular cattle from the ranch to the stock pens, we think that Lucas, as the agent of the railway company, had no legal concern. If uninspected clean cattle, though exposed to the disease of scabies, had been in the pens preparatory to shipment to Kansas City for immediate slaughter, and the federal inspector passed

the shipment, it is clear to us that the railroad company, under the federal regulations, should have transported the cattle. The trial court's charge is a simple presentation of the issues without any substantial technical objection to the same.

It is denied in the motion for rehearing that facilities existed in St. Joe and Kansas City, Mo., for the purpose of taking care of the class of cattle mentioned in this record. Dr. Pearson, employed by the United States Department of Agriculture as a veterinary inspector, in testifying in regard to the interstate shipment of uninspected exposed cattle, and the rules regulating the transportation of same, said:

"They have such pens as required by the above rule at both St. Joe and Kansas City, and did have in 1913."

The motion for rehearing is overruled.