The judgment is reversed and the cause remanded for a new trial. All concur.

---

ED. S. MILLER, Respondent, v. QUINCY, OMAHA & KANSAS CITY RAILROAD COMPANY, Appellant.

Kansas City Court of Appeals November 8, 1920.

1. **COMMON CARRIERS: Embargo: Damages.** An embargo having been declared by the Chicago Stock Yards Company, a connecting carrier stopped a shipment of livestock, destined for the Chicago market, at an intermediate point where the stock could be unloaded, watered and fed. The carrier had no control over the Stock Yards Company. *Held;* that the shipper was not liable for sub-

stantial damages because of the delay in delivering the shipment at destination.

2. ———: Federal Rule: Negligent Delay: Interstate Shipments. Under the Federal rule, before a carrier can be held liable for delay or failure to promptly deliver a shipment of livestock at destination, the shipper must show either negligence or some other fault upon the part of the carrier; and, if the delay is induced by causes beyond the carrier's control, the latter is excused, regardless of the agency producing such delay.

3. ———: Embargo: Diverting Shipment. A shipment of sheep, originating in Missouri, for carriage to Chicago, was delivered by the initial carrier to a connecting carrier and by the latter stopped, before reaching destination, because of an embargo at the Chicago Stock Yards. Thereafter the shipment was diverted, by the shipper, to another market and while enroute thereto, was negligently delayed. *Helds* that the initial carrier was liable for such negligent delay, the change in destination, under these circumstances, not being an abandonment of the shipper's contract with the initial carrier.

4. ———: Evidence: Account of Sales. An "Account of Sales," furnished a shipper by his commission agent, who sold a shipment of sheep for him upon the market, is not admissible in evidence without proof that it correctly shows what the sheep actually sold for.

Appeal from Adair County Circuit Court.—*Hon. James A. Cooley*, Judge.

REVERSED AND REMANDED.

*Higbee & Mills* for respondent.

*Campbell & Ellison* and *J. G. Trimble* for appellant.

TRIMBLE, J.—This action for damages grows out of a shipment of fat sheep which, as alleged in the petition, were intended by plaintiff for sale on the market at the Union Stock Yards in Chicago.

The transportation began on the morning of Sunday, November 26, 1916, at Bullion, Missouri, on defendant's line; and the shipment went thereon, safely and in due time, to Quincy, Illinois, the end of defendant's railroad, where the animals were turned over to the

Chicago, Burlington & Quincy Railroad Company, the connecting carrier, to be by it carried on to destination. In due time, shortly after noon of the 26th, the shipment left Quincy on the Burlington and arrived at Galesburg, an intermediate point, about the usual time —seven o'clock that evening. Ordinarily, shipments thus orginating at Bullion in the morning of one day would arrive at the stockyards in Chicago anywhere from six to nine o'clock in the morning of the next day and be ready for that day's market.

About three o'clock in the afternoon of the 26th, while the sheep were enroute between Quincy and Galesburg, the Union Stock Yards Company informed the Burlington Live Stock Agent at the Union Stock Yards that the Yards were going to get out an embargo against all shipments from Missouri, Kansas and Nebraska, and that he had better arrange to have all stock then en route held until such time as disposition could be made thereof or until the Stock Yards could receive it.

Knowing from past experience that if an embargo were put on, unloading would be refused by the Stock Yards, the Burlington Live Stock Agent notified the Burlington Superintendent of Transportation at Chicago and the Burlington General Superintendent at Galesburg that the Union Stock Yards had advised him that, on account of prevalence of Foot and Mouth Disease, the Yards would not accept stock from Missouri, Kansas or Nebraska and that they had "better arrange to hold all stock from this territory as probably unloading will be refused."

The General Superintendent at Galesburg wired the Superintendent of Transportation asking what course to pursue. The latter replied that it would be necessary to hold stock at Galesburg until definite information could be obtained. Fifty minutes later, to-wit, at 9:43 p. m. of November 26th, at the request of the Union Stock Yards Company, the President of the Chicago Junction Railroad Company (the carrier which takes

into the Yards all stock coming to Chicago on the various railroads), sent a telegram to all railroad companies entering Chicago that, effective at 12:01 a. m. Monday, November 27, and continuing until further notice, "the Union Stock Yards of Chicago, Illinois, will not receive, accept or unload any shipments of . . . sheep and other ruminants originating at or shipped from any stations or points within the States of Kansas, Nebraska and Missouri." . . .

This refusal of the Union Stock Yards to receive, accept or unload such stock came about in this way. The President of the Union Stock Yards Company called the attention of Dr. Bennett, who was the Stock Yards Superintendent of Sanitation, to a rumor that Foot and Mouth Disease had appeared in the Kansas City Stock Yards introduced by cattle from Nebraska. Dr. Bennett immediately called by telephone the Chief of the Bureau of Animal Industry at Washington who replied advising that "every precaution possible" be taken. Dr. Bennett then advised the Union Stock Yards Company to "shut off all shipments" from Kansas, Missouri and Nebraska until it was fully determined what the nature of the disease was in the Kansas City Stock Yards. Thereupon the Union Stock Yards Company directed the above notice to be sent.

Upon arrival of the shipment at Galesburg, plaintiff, who accompanied it, got his supper and returned to the train expecting to resume the journey to Chicago, but was told, along with a number of other shippers, of the orders received and that the shipments would be held until further notice. Plaintiff said nothing when told this and went to a hotel for the night and the railroad unloaded the sheep.

The next morning, according to plaintiff's evidence, he requested the agent to send his stuff back to Bullion "provided he couldn't send it on to Chicago," but was told that this could not be done without a special permit from the Missouri State Veterinarian. Later on in the trial he testified that on Monday he told the railroad officials there wasn't anything to prevent the ship-

ment going on and repeatedly requested that it be taken on to Chicago which they refused to do. Plaintiff then asked the railroad officials that if he could not get his stock on to Chicago or back home how would it be if the shipment could be sent to the National Stock Yards at East St. Louis, and was told that they were working on the matter and would let him know. The road officials had, already that morning, sent a message to the Burlington General Superintendent at St. Louis inquiring whether similar restrictions had been placed on stock from Missouri, Kansas and Nebraska by either the Independent Stock Yards at St. Louis or the National Stock Yards at East St. Louis. At 10:26 Monday morning an answer was received saying the stock yards people had not yet decided what they would do but were in consultation with the U. S. Government representative and would advise definitely later. At 12:13 p. m. Monday, the General Superintendent at St. Louis wired that the stock yards there said they were in the same position as the Stock Yards at Chicago and expected to issue same restrictions at once. At 3:37 Monday afternoon, the Burlington Superintendent of Transportation at Chicago again wired asking in reference to stock embargo at St. Louis, and at 5:12 that afternoon the St. Louis official answered that the Stock Yards there would not accept any stock except for immediate slaughter.

The next morning, Tuesday, November 28, the shippers were told that their stock could be sent to the National Stock Yards at East St. Louis, and thereupon plaintiff gave to the railroad a written order diverting the shipment to that point care of the same firm to which it had been consigned in Chicago. Other shippers diverted their stock to the same point, but some waited at Galesburg and then went on to Chicago December 3, after the embargo had been raised, which was done on December 1st, the rumor as to the dreaded Foot and Mouth Disease having been ascertained, upon investigation, to be unfounded.

Plaintiff's stock was in the first bunch that went out to St. Louis and the sheep were loaded and left at 2:20 p. m. Tuesday, the 28th. They arrived at St. Louis 9:30 Wednesday morning, November 29th, and were in the selling pens at 11:30. The sheep were greatly shrunken, so much so that they were not recognizable as the same sheep that started and could not be regarded or sold as fat sheep. Buyers came and looked at them but shook their heads and went away and no sheep were sold on that market after plaintiff's sheep arrived. The next day was Thanksgiving and the Yards were not open, so the sheep were held over and sold on December 1st. The suit is for damages caused by the alleged wrongful stopping and holding of the shipment at Galesburg instead of taking it on to Chicago in time to be sold on the market at the Union Stock Yards on the morning of November 27th; also for damages caused by alleged improper feeding and watering of the sheep, the jury should find for plaintiff for such loss, if delay in the transportation from Galesburg to St. Louis after they started to the latter point, by reason of all which an extra shrink occurred and an extra feed bill had to be paid, aggregating $744.60.

The trial court instructed the jury that no justification was shown by the defendant for the connecting carrier's refusal to promptly deliver the plaintiff's stock at the Union Stock Yards in Chicago, nor for the detention of said stock at Galesburg; and that if they found from the evidence that plaintiff was damaged in consequence of such refusal to carry to destination, and delay in the shipment, and failure to properly feed and water the sheep while at Galesburg, and for damages caused by any, sustained by reason of such failure to transport the stock to said Union Stock Yards at Chicago not to exceed $744.60, the amount asked in the petition. The jury returned a verdict, in plaintiff's favor, of $600, and defendant has appealed.

Plaintiff's sheep were not diseased, and, as stated, upon investigation, it turned out that no Foot and Mouth

Disease existed. Furthermore, the embargo declared by the Union Stock Yards Company was not a legal quarantine such as is provided for by the Act of Congress of March 3, 1905 (U. S. Comp. Stats. of 1918, sec. 8701), since the Secretary of Agriculture did not order it. [State v. Chicago, etc., R. Co., 206 S. W. 419.] There is no contention that there was a *legal* quarantine established, but only that the Union Stock Yards placed an embargo on stock emanating from the above named territory and refused to receive, accept or unload same until further notice. And there is no question but that this was done, and that such embargo was not lifted until December 1st. The evidence is that there were no facilities for unloading at Chicago except those afforded by the Stock Yards Company. The carrier had no control over the Stock Yards, and defendant's contention is that the Stock Yards Company's refusal to receive or unload the stock' was an occurrence beyond the carrier's control and excuses it for stopping at Galesburg instead of continuing on to Chicago. There is some contention on the part of plaintiff that had the carrier taken the sheep on to Chicago, despite the Yard's announced refusal to accept them, they would have been received and unloaded in the quarantine pens and sold for immediate slaughter. The only evidence on this point was that of Merrion, a witness for plaintiff, who was merely a sheep salesman on the market at the Union Stock Yards, who said the Stock Yards might have permitted stock to come into the quarantine division of the Yards, but it would have been at the discretion of the veterinarians, and the veterinarians, or doctors, were "bosses of the situation." Dr. Bennett, however, testified that if a shipment from Missouri had arrived in Chicago on Monday morning, November 27, 1916, it would not have been admitted to the Stock Yards; and the General Manager of the Yards testified that they would not have been unloaded.

The shipment was interstate, and liability is, therefore, governed by the rules of decision in the Federal Courts. It must also be borne in mind that this is not a

case where there was an absolute failure to deliver at all. The connecting carrier merely refused to deliver promptly, and stopped the transportation at Galesburg solely because of the refusal of the Stock Yards Company to receive, accept or unload it, and such stoppage was only until the embargo would be lifted, the carrier being ready and willing to take it on to Chicago as soon as the embargo was removed, or to take it anywhere else the shipper desired, if same could be done. In other words, there was no absolute and final refusal to deliver but only a refusal to deliver promptly whereby a *delay* occurred in the transportation called for in the shipping contract.

Under the Federal rule, before the carrier can be held liable for delay, or failure to deliver promptly, the shipper must show either negligence or some other fault upon the part of the carrier. [Berry v. Chicago, etc. R. Co., 208 S. W. 622; Baker v. Schaff, 211 S. W. 103.] The absence of negligence or other fault excuses a carrier for delay. [2 Hutchinson on Carriers (3 Ed.), sec. 653.] And if delay is induced by causes beyond the carrier's control, the latter is excused regardless of the agency producing such delay. It does not have to be an Act of God or caused by the public enemy. [1 Mitchie on Carriers, sec. 908; 6 Cyc. 645, 646; Gulf, etc., R. Co. v. Levi, 76 Tex. 337; Dawson v. Chicago, etc. R. Co., 79 Mo. 296; Dillender v. St. Louis, etc., R. Co., 149 Mo. App. 331, 337; Missouri, etc., R. Co. v. Stark, 131 S. W. 410; Geismer v. Lake Shore, etc., R. Co., 102 N. Y. 563.]

However, in the case at bar, the refusal of the Union Stock Yards Company to receive or unload the shipment did not, like a washout or some other occurrence on the railroad, actually *prevent* the carrier from transporting the stock on to Chicago and tendering it to the Stock Yards within the reasonable time contemplated by the shipping contract. And since plaintiff was with the shipment, and, according to his evidence, demanded that such contract be carried out, did he not have the technical right to have that done? Doubtless he did have that right. But, even so, is he entitled, *under the circum-*

*stances of this case,* to anything more than nominal damages for the violation of that right? The case before us is peculiar. The stock were fat animals shipped to the market at the Union Stock Yards and intended for sale on said market. If the Stock Yards—whether rightfully or wrongfully—would not receive or unload them, they could not get upon that market; and there being no other facilities for unloading at Chicago, they would have had to be held in the cars until they could be taken elsewhere and would thereby have suffered worse injury than if unloaded and properly cared for at Galesburg until the embargo was lifted or until they could be delivered at some other market selected by the shipper. The shipment was not one of that character which, if the transportation to Chicago had been effected, the shipper's property would not have deteriorated but could have been there used or disposed of by the shipper. Had it been of that character, the refusal of the carrier to transport same thither would have resulted in an injury undoubtedly entitling him to substantial damages. But the shipment here involved, if denied admittance to the Stock Yards, would not have gotten upon the market of Monday, November 27th, even though the carrier had brought them on to Chicago; and the stock would have suffered far greater injury than if held and properly cared for at Galesburg. So that whatever technical right the shipper may have had to demand that the cattle be carried on to Chicago, despite the refusal of the Stock Yards to receive or unload them, we are unable to see wherein he is entitled to damages arising out of a failure to reach a certain day's market which he would not have reached even though the carrier had acceded to his technical right to have the contract performed. The carrier had no control over the Union Stock Yards Company, neither did the carrier act on its own initiative. The Stock Yards positively and unqualifiedly refused to accept or unload the stock and warned the carrier not to bring them. It is not a case where the carrier, *on its own initiative, erroneously* construed a law and refused to accept or trans-

port property merely because it thought it would be subjecting itself to the penalties of the law if it transported the property. Such were the cases of Southern Express Company v. Rose, 124 Ga. 581; 5 L. R. A. 619, 53 S. E. 185, and Pecos, etc., R. Co. v. Hall, 189 S. W. 535.

So that we do not think plaintiff is entitled to substantial damages for failure to reach Monday's market at the Stock Yards in Chicago merely because of his technical right to have the contract of carriage performed. Hence the judgment rendered should not be permitted to stand.

But there was some evidence that while the sheep were held at Galesburg until disposition could be made of them they were not given proper food and water; also that there was unnecessary delay in the transportation of the sheep from Galesburg to St. Louis whereby they had to be held over Thanksgiving and were thereby caused to suffer still greater loss. Of course, if damages was caused either from failure to properly care for the sheep while at Galesburg or by delay in transporting them to St. Louis, the carrier guilty of these things would be liable for the damage caused thereby. Is the defendant herein, the initial carrier, liable under the Carmack Amendment to the Interstate Commerce Act? It is clear to our minds that, as to the failure to properly feed and water the stock while being held at Galesburg, the initial carrier would be liable since, under the Federal law, the initial carrier is liable for any negligence of a connecting carrier, and the latter owed plaintiff the duty of properly feeding and watering the sheep (2 Hutchinson on Carriers (3 Ed.), sec. 653), which duty arose, under the circumstances, by virtue of the contract plaintiff made with the initial carrier. But after the shipment was diverted to St. Louis, without notice to the initial carrier, is the latter liable for the negligence of the connecting carrier for delay in the transportation from Galesburg to St. Louis? In cases where goods were voluntarily rerouted by the shipper over another line without notice to the initial carrier, the latter was held not

liable. [1 Roberts on Federal Liability of Carriers, sec. 346.] But in the cases mentioned and as stated in said work, the goods had reached the destination contracted for. In the case at bar, however, the sheep did not reach the destination contracted for but were stopped by the connecting carried at an intermediate point. The shipper did not voluntarily reroute the stock over some other connecting carrier's line to St. Louis, but, in order to minimize his loss if possible, he directed it to be sent to St. Louis over the connecting carrier's line, after he could not have the original contract performed. It was his duty to minimize his loss, and his attempt to do so, by having the stock sent to St. Louis when he could not get them sent to Chicago, was not an abandonment of his contract with the initial carrier. [Plesofsky v. Kaufman, 1 A. L. R. 433, 434.] Hence we are of the opinion that the initial carrier is liable also for any negligent delay occurring in the transportation from Galesburg to St. Louis.

"The "Account of Sales" which plaintiff received for the sale of his sheep at St. Louis should not have been admitted without proof that it correctly showed such sales. No such proof was introduced. Hazelwood said it was a correct *copy* but does not say the "account of sales" was correct and showed what the sheep actually sold for. [Stockwell v. Union Pacific R. Co., 182 S. W. 829; Moore v. St. Louis & San Francisco R. Co., 143 Mo. App. 675.]

Several other complaints are made concerning the admission of evidence in plaintiff's behalf. We think the evidence as to the promise of a "passenger run" from Galesburg to St. Louis was not admissible. The case was not based on any promise of that kind and if it were, such evidence would come dangerously near making a "new contract" of shipment different from the one the initial carrier had made. The fact of the conductor's fretting at the engineer during the trip to St. Louis, over the unusally slow speed of the train with no apparent cause for the lack of speed, would, along with all the

other circumstances, tend to show negligent delay and would be admissible.

For the reasons hereinabove stated the judgment is reversed and the cause remanded for a new trial. The other judges concur.